OLAF B. LIGHTHILL AND NADINE LIGHTHILL, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 713-75. Filed August 31, 1976.

*Dennis A. Roach,* for the petitioners.
*Hector C. Perez,* for the respondent.

OPINION

SCOTT, *Judge:* Respondent determined a deficiency in petitioners' Federal income tax for the calendar year 1969 in the amount of $35,775.

The issues for decision are (1) whether petitioners realized income in 1969 on the lapse of restrictions on stock which one of them had acquired in 1968 under an option received in a prior year and if so the amount of income realized, and (2) the amount of capital gain petitioners realized later in 1969 upon the sale of one-third of that stock.

All of the facts have been stipulated and are found accordingly.

Petitioners, husband and wife, who resided in South Pasadena, Calif., at the time of filing the petition in this case, filed a joint Federal income tax return for the calendar year 1969 with the Director, Internal Revenue Service Center, Ogden, Utah.

From 1957 to 1970, Olaf B. Lighthill (petitioner) was employed by the securities firm of Dempsey-Tegeler & Co. (Dempsey). During 1967 Dempsey was engaged in underwriting a public issue of securities for King Resources Co. (King). In connection with the underwriting, King agreed to sell Dempsey capital stock purchase warrants for $3,000, which when exercised would yield 30,000 shares of King common stock. The agreement was evidenced by a letter dated February 24, 1967, and a warrant purchase agreement dated June 19, 1967.

The terms of the warrant purchase agreement provided for a purchase price for each warrant of $0.10. The price of the stock at exercise was established and was an amount increasing yearly. The exercise period began May 28, 1968, and ended at 4 p.m., June 28, 1972, Denver, Colo., local time. Dempsey was entitled to assign the right to purchase the warrants.

In 1967, Dempsey assigned to petitioner the right to purchase 500 warrants, and during that year petitioner exercised this right, purchasing 500 warrants at $0.10 per warrant. These warrants, which could not be exercised until 1 year after their acquisition, were not traded on an established market and were not otherwise freely transferable. On or about February 1, 1968, King common stock split on a 3-for-1 basis. The number of stock warrants held by petitioner and the purchase price per share were adjusted accordingly.

On February 7, 1968,[1] Dempsey notified petitioner that it had received warrants on June 19, 1967, which it valued at $325.48 per 100 warrants. Dempsey stated that for its 1967 fiscal year it had reported as ordinary income the difference between the purchase price of the warrants and their fair market value. Petitioner on his original Federal income tax return for the calendar year 1967 did not report any amount as income from the receipt of the warrants.

Petitioner exercised his stock purchase warrants on June 10, 1968, purchasing 1,500 shares of King common stock for $7,000. These shares were not registered with the Securities and Exchange Commission pursuant to the Securities Act of 1933. In connection with the exercise of the rights granted in the warrants, petitioner executed an "investment letter" which provided in pertinent part as follows:

---

[1] Although the parties stipulated the date to be Feb. 7, 1967, it is apparent to the Court that it was intended to be Feb. 7, 1968.

As provided under Section 2 of the Common Stock Purchase Warrant dated June 28, 1967 between King Resources Company and myself, I hereby represent that the 1,500 shares of Common Stock being acquired through the exercise of said Warrant are being acquired to be held for investment and without the intention of public re-offering.

I also hereby represent and warrant that the shares being acquired will not be offered publicly until a Post-Effective Amendment relating to the proposed terms of the disposition of such shares shall have been made effective by the Securities and Exchange Commission. As outlined in the Warrant "Post-Effective Amendment" includes any form of registration or exemption from registration acceptable to the Securities and Exchange Commission.

The fair market value of King common stock on June 10, 1968, without regard to any lack of registration or the agreement contained in petitioner's "investment letter" was $48 per share, or $72,000 for the 1,500 shares acquired by petitioner.

On March 14, 1969, shares of King common stock, of which petitioner's 1,500 shares were a part, were registered with the Securities and Exchange Commission pursuant to a prospectus issued by King on that date. On March 19, 1969, petitioner sold 500 of the 1,500 shares for $41,250.

Petitioner subsequently filed an amended Federal income tax return for the calendar year 1967 on or about May 5, 1969, showing an increase in ordinary income of $1,450 for that year. Petitioner explained this revision in his 1967 income as follows:

On or about June 20, 1967, in connection with an underwriting of shares of stock of King Resources which my firm, Dempsey-Tegiler & Co. Inc. [sic], managed, they received certain warrants to purchase shares of stock.

Pursuant to arrangements with my firm I received 500 of said warrants for a total purchase price of $50.00.

In the preparation of my federal income tax return for the year 1967 I did not report the receipt of said warrants because I thought I was not required to, even though they then had an ascertainable market value of $1,500.00. I have since been advised that the value of these warrants should have been reported as income in the year of their receipt. Accordingly, this value of the warrants over then cost, or $1,450.00.

Petitioner on his Federal income tax return for the year 1969 reported a long-term capital gain of $38,417 from the sale of the 500 shares of King common stock on March 19, 1969. This figure was derived from a sale price of $41,250 and a basis of $2,833.[2]

---

[2] Apparently this basis figure represented one-third of the sum of (1) the amount paid for all of the warrants ($50), (2) the amount recognized by petitioner in his amended 1967 return on receipt of all warrants ($1,450), and (3) the amount paid on exercise of the 1,500 warrants ($7,000).

Respondent in his notice of deficiency to petitioners increased their reported gross income for 1969 by $65,000, stating this to be an amount realized as compensation for services rendered by petitioner in connection with the underwriting of the King securities. Respondent decreased petitioners' long-term capital gain by $10,583, which resulted from an increase in petitioner's basis for the 500 shares of King stock which he sold in 1969 to $48 per share. This $48 was the value per share of King stock used by respondent in computing petitioner's gross income from compensation for services.

Both parties here agree that petitioners' warrants to purchase stock were not a statutory stock option under section 421, I.R.C. 1954,[3] and that there were no statutes in effect controlling options such as the one involved in the instant case at the time these transactions occurred.[4] Respondent relies on the provisions of section 1.421-6, Income Tax Regs.[5]

Section 1.421-6(d), Income Tax Regs.,[6] governs taxation of the

---

[3] All references are to the Internal Revenue Code of 1954, unless otherwise indicated.

[4] Sec. 83, I.R.C. 1954, was not applicable under the transition rules contained in subsec. (i).

[5] Sec. 1.421-6. Options to which section 421 does not apply.

(a) *Scope of section.* (1) If an employer or other person grants to an employee or other person for any reason connected with the employment of such employee an option to purchase stock of the employer or other property, and if section 421 is not applicable, then this section shall apply. This section will apply, for example, when an option is not a qualified or restricted stock option at the time it is granted * * *

[6] Sec. 1.421-6(d), Income Tax Regs., provides as follows:

(d) *Options without a readily ascertainable fair market value.* If there is granted an option to which this section applies, and if the option does not have a readily ascertainable fair market value at the time it is granted, the employee in connection with whose employment the option is granted is considered to realize compensation includible in gross income under section 61 at the time and in the amount determined in accordance with the following rules of this paragraph:

(1) Except as provided in subparagraph (2) of this paragraph, if the option is exercised by the person to whom it was granted, the employee realizes compensation at the time an unconditional right to receive the property subject to the option is acquired by such person, and the amount of such compensation is the difference between the amount payable for the property and the fair market value of the property at the time an unconditional right to receive the property is acquired. An individual has an unconditional right to receive the property subject to the option when his right to receive such property is not subject to any conditions, other than conditions that may be performed by him at any time. Thus, if an individual who has exercised an option has a right to make payment for the property at any time and to receive the property immediately after making such payment, such individual realizes compensation at the time he exercises the option. However, if an individual who has exercised an option is prevented by the terms of the option contract from making payment immediately or from receiving an immediate transfer of the property after making payment, such individual does not realize compensation at the time he exercises the option. Such individual will not realize compensation until he does acquire the right to make payment immediately and to receive an immediate transfer of the property. For purposes of this paragraph, an unconditional right to receive the property subject to the option shall not be considered to have been

receipt of an option having no "readily ascertainable fair market value." Under section 1.421-6(c)(3)(i), an option "not actively traded on an established market" has no readily ascertainable fair market value unless certain stringent conditions are met.[7] The options in the instant case fail to meet the conditions that they be freely transferable and that they be exercisable immediately, and petitioner does not now contend that the options he acquired had a readily ascertainable fair market value when acquired.

Paragraph (d) of section 1.421-6 of the Income Tax Regulations defers realization of income from the receipt of an option without an ascertainable fair market value either until the receipt of the stock on the exercise of the option, if the stock is received without restrictions significantly affecting its value, or until the lapse of the restrictions on the stock received when it is received with such restrictions.[8] Under the regulations the income when realized is ordinary income from compensation for services, and the basis of the stock held at realization is increased by the amount realized. Sec. 1.421-6(e)(1), Income Tax Regs.

The parties agreed that petitioner realized no income on exercise of the options in 1968 because of restrictions on

acquired before the date on which the option is exercised.

(2)(i) If the option is exercised by the person to whom it was granted but, at the time an unconditional right to receive the property subject to the option is acquired by such person, such property is subject to a restriction which has a significant effect on its value, the employee realizes compensation at the time such restriction lapses or at the time the property is sold or exchanged, in an arm's length transaction, whichever occurs earlier, and the amount of such compensation is the lesser of—

(a) The difference between the amount paid for the property and the fair market value of the property (determined without regard to the restriction) at the time of its acquisition, or

(b) The difference between the amount paid for the property and either its fair market value at the time the restriction lapses or the consideration received upon the sale or exchange, whichever is applicable. If the property is sold or exchanged in a transaction which is not at arm's length before the time the employee realizes compensation in accordance with this subdivision, any amount of gain which the employee realizes as a result of such sale or exchange is includible in gross income at the time of such sale or exchange, but the amount includible in gross income under this subdivision at the time of the expiration of the restriction or the sale or exchange at arm's length shall be reduced by the amount of gain includible in gross income as a result of the sale or exchange not at arm's length.

[7] These conditions for finding "readily ascertainable fair market value" under the regulations were upheld in *Jack I. LeVant,* 45 T.C. 185 (1965), revd. on another issue 376 F.2d 434 (7th Cir. 1967).

[8] The parties now agree that petitioner's inclusion of $1,450 in income in his amended return for 1967 as the value of the warrants received over their cost was improper. See *Jack I. LeVant,* referred to in n. 7 *supra.*

disposition of the shares acquired under the provisions of the Securities Act of 1933 and petitioner's investment letter. Because of this agreement no issue is presented here of whether the restrictions on the sale of the shares when petitioner acquired them in 1968 in fact have "a significant effect" on the value of the stock.[9]

Under respondent's regulations ordinary income is realized by petitioner on March 14, 1969, when the restrictions on transferability of petitioner's stock ended. The amount of income realized is the difference between the fair market value of the King common stock without regard to any restrictions when it was purchased by petitioner on June 10, 1968, and the amount petitioner paid for the stock.[10] Under the facts stipulated in this case, this amount is $64,950, the difference between $72,000 and $7,050, the latter figure being the sum of $50 which petitioner paid for the options and the $7,000 he paid on their exercise.[11]

Under the regulations, the basis of petitioner's 1,500 shares of King common stock is increased by the $64,950 included in income on March 14, 1969. Therefore, under respondent's regulations on the sale of 500 shares on March 19, 1969, petitioner would realize a capital gain less than that reported by him.

Petitioner does not contend that under section 1.421-6(d), Income Tax Regs., his income is not properly computed by respondent (except for the $50 inadvertently omitted from the cost basis of his stock), but contends that this regulation is contrary to the rule established by this Court in *Robert Lehman,* 17 T.C. 652 (1951). The taxpayer in the *Lehman* case was a partner in a firm that acquired stock on the exercise of options received as compensation for services. The parties agreed that no income was realized in the year of acquisition of the stock because of restrictions on the disposition of the stock resulting in the stock having no readily ascertainable fair market value when acquired. At midnight of the year the stock was acquired the

---

[9] Therefore, this Court does not reach the issue presented by *Ira Hirsch,* 51 T.C. 121 (1968), and *Frank v. Commissioner,* 447 F.2d 552 (7th Cir. 1971), affg. 54 T.C. 75 (1970), in which the effects of nonregistration and of granting investment letters were considered.

[10] This amount is less than the alternative amount described in sec. 1.421-6(d)(2)(i)(*b*), Income Tax Regs.

[11] Respondent in computing the $65,000 additional income received by petitioner in 1969 did not include in petitioner's cost of the shares the $50 petitioner paid for the warrants. However, under respondent's regulations this $50 is clearly a part of the cost of petitioner's stock and was apparently omitted inadvertently.

restrictions lapsed, and the stock was sold during the following February and March. The taxpayer in the *Lehman* case reported a capital gain on the sale of the stock. The Commissioner asserted that the taxpayer received ordinary income as compensation for services which was realized on the lapse of the restrictions as of January 1, and that the amount of such income was the difference between the fair market value of the stock at the time of lapse of the restriction and its cost to the taxpayer. We stated (at p. 654) that:

[The Commissioner] cites a number of cases holding that no income is realized when the shares are received subject to restrictions which preclude ascertainment of fair market value but none holding that compensation is received or a taxable event takes place when the restrictions terminate and fair market value can be determined. Termination of the restrictions was not a taxable event such as the receipt of compensation for services or the disposition of property. Values fluctuate from time to time and the value on a later date might be out of all proportion to the compensation involved in the original acquisition of the shares. The gain was properly reported as a long term capital gain from the subsequent sale of the shares.

Petitioner contends that respondent's regulations are clearly contrary to the holding of this Court in the *Lehman* case and are therefore invalid. While under the regulations the income received by a taxpayer is measured by use of the fair market value of the stock without restrictions at the date of its purchase if such amount is less than the fair market value at the date the restrictions are ended, which respondent contended should be used in the *Lehman* case, it is clear, as petitioner contends, that the underlying basis of respondent's regulations is contrary to our holding in the *Lehman* case.[12] Therefore, it is necessary for us to determine whether that case still has vitality since the decision in *Commissioner v. LoBue,* 351 U.S. 243 (1956), and the numerous cases subsequent to that decision.

In *LoBue,* the Supreme Court in considering the extent to which options received in an employment context were taxable stated that, absent evidence of some specific statutory exclusion from gross income, the receipt of such options would be

---

[12] In fact in *Owen G. Anderson,* T. C. Memo. 1970-271, we stated:

"Respondent concedes on brief that the regulations here in question were promulgated 'to close an apparently unintended loophole' in the taxation of stock acquired under certain circumstances pursuant to non-statutory stock options, which 'loophole' respondent conceives might be considered as having been created by the cases of *Harold H. Kuchman,* 18 T.C. 154 (1952) and *Robert Lehman,* 17 T.C. 652 (1951), when those cases are read together. * * *"

compensation for services taxable as ordinary income at some point in time.[13] In the *LoBue* case the Court held that realization of such income was deferred when the options received had no readily ascertainable fair market value and were not transferable. In that case the stock received on exercise of the options was transferable and free of other restrictions, and the Court held that income was realized by the taxpayer when the options were exercised.

The essential difference between the *LoBue* case and the *Lehman* and instant cases is the presence in the latter cases of restrictions significantly affecting the value of the stock received when the options were exercised. Respondent's regulations provide that such cases justify a further deferral of realization until the restrictions lapse. Under our holding in *Lehman,* the taxpayer was held not at any time to realize income as compensation for services from receipt of the options and stock. This holding is contrary to the clear import of the opinion of the Supreme Court in the *LoBue* case. For this reason we conclude that the opinion in the *LoBue* case invalidates our holding in *Lehman.* Under the holding of the Supreme Court in *LoBue,* a taxpayer receiving an option to purchase stock and subsequently receiving the stock in an employment context must at some time realize income from this receipt as compensation for services.

While it is clear from the decision of the Supreme Court in the *LoBue* case, which was rendered subsequent to our decision in *Lehman,* that the holding in *Lehman* is no longer vital, the question remains of whether respondent's regulations are valid in deferring realization of income only until the lapse of restrictions on the stock rather than until the time of sale of the stock. In our view, under the holding in *LoBue* a time prior to the time of sale of the stock can be an appropriate time for

---

[13] In *Commissioner v. LoBue,* 351 U.S. 243, 246-247 (1956), the Court stated:

"We have repeatedly held that in defining 'gross income' as broadly as it did in sec. 22(a) Congress intended to 'tax all gains except those specifically exempted.' See, *e.g., Commissioner v. Glenshaw Glass Co.,* 348 U.S. 426, 429-430 [75 S.Ct. 473, 476, 99 L.Ed. 483]. The only exemption Congress provided from this very comprehensive definition of taxable income that could possibly have application here is the gift exemption of sec. 22(b)(3). But there was not the slightest indication of the kind of detached and disinterested generosity which might evidence a 'gift' in the statutory sense. * * *
* * *

"Section 22(a) taxes income derived from compensation 'in whatever form paid.' And in another stock option case we said that sec. 22(a) 'is broad enough to include in taxable income any economic or financial benefit conferred on the employee as compensation, whatever the form or mode by which it is effected.' * * *"

realization of income. In the *LoBue* case the taxpayer contended that the exercise of the option at a bargain price was a "mere purchase" not requiring realization of income. In answer the Court stated:

It is true that our taxing system has ordinarily treated an arm's length purchase of property even at a bargain price as giving rise to no taxable gain in the year of purchase * * *. But that is not to say that when a transfer which is in reality compensation is given the form of a purchase the Government cannot tax the gain under section 22(a). The transaction here was unlike a mere purchase. It was not an arm's length transaction between strangers. Instead it was an arrangement by which an employer transferred valuable property to his employees in recognition of their services. We hold that LoBue realized taxable gain when he purchased the stock. [*Commissioner v. LoBue,* 351 U.S. 243, 248 (1956); fn. refs. omitted.]

While the decision of the Supreme Court in *LoBue* saps the vitality of the *Lehman* case, in *Glenn E. Edgar,* 56 T.C. 717 (1971), this Court specifically applied the provisions of section 1.421-6(d)(2), Income Tax Regs.

The taxpayer in the *Edgar* case had performed legal and financial services for the owners of a corporation. As compensation for his services, a trust established by the taxpayer was allowed to purchase stock in the corporation at a bargain price, and Mr. Edgar was held to be taxable on the benefit obtained from this bargain purchase. Since the stock received was subject to an option to repurchase at the original purchase price for a period of 18 months, this Court held that section 1.61-2(d)(5), Income Tax Regs., applied to the income received from the bargain purchase and applied section 1.421-6(d)(2), Income Tax Regs., in holding that the income from the bargain purchase was received in the year in which the 18-month option lapsed.[14] Our specific approval of section 1.421-6(d)(2)(i) of the

---

[14] In *Glenn E. Edgar,* 56 T.C. 717, 747-748 (1971), we stated:

"The amount and timing of the taxable compensation received by Edgar depend upon the value of the property at the date of the lapse of the option. Section 1.61-2(d)(5), Income Tax Regs., provides that when 'any property * * * is transferred by an employer to an employee or independent contractor as compensation for services and * * * is subject to a restriction which has a significant effect on its value, the rules of paragraph (d)(2) of sec. 1.421-6 shall be applied in determining the time and the amount of compensation to be included in the gross income of the employee or independent contractor.' Since the stock received by the CR-7007 trust was subject to the option of Russell and Arthur to repurchase it within 18 months for what the trust had originally paid and the option expired with the sale to BYU in January of 1964, the amount of compensation is, as provided in regulations section 1.421-6(d)(2)(i):

the lesser of—

    (a) The difference between the amount paid for the property and the fair market

Income Tax Regulations in the *Edgar* case is a clear recognition that our holding in *Lehman* is no longer vital since the decision of the Supreme Court in *LoBue.* In the *Edgar* case, we recognized the validity of respondent's regulations both as to time of realization of income and as to the computation of the amount of such income. See also *Jack I. LeVant,* 45 T.C. 185, 197 (1965), revd. on another issue 376 F.2d 434 (7th Cir. 1967); *Ira Hirsch,* 51 T.C. 121 (1968); *United States v. Frazell,* 335 F.2d 487 (5th Cir. 1964).

Respondent's regulation is a reasonable interpretation of the law as developed by the cases decided after our decision in *Lehman.* It is consistent with the broad scope of section 61, upon which it must rely for authority. We hold that respondent's regulation, as applied to the facts of this case, is reasonable and valid.

Since we hold that respondent has properly included in petitioners' gross income the difference between the cost of the stock received and its fair market value on the date received without regard to restrictions, it follows that respondent properly reduced the capital gain reported by petitioner. In fact, petitioner does not question respondent's computations if we hold his regulation valid except for omission of the $50 cost to him of the warrants. Although we decide the only issues presented for respondent, to permit adjustment for the $50 of cost,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

---

value of the property (determined without regard to the restriction) at the time of its acquisition, or

(b) The difference between the amount paid for the property and either its fair market value at the time the restriction lapses or the consideration received upon the sale or exchange, whichever is applicable.

"In view of the uncontradicted testimony of petitioners' expert witness, we have found that the fair market value of the 186 shares, a minority interest in a closely held corporation, as of June 10, 1963, was $56,250. This valuation reflects a 25-percent discount of the January 1964 sales price, attributable primarily to the minority interest factor. Consequently, the amount of the compensation was $56,250 less the $100 paid for the stock, or $56,150. This amount is includable in Edgar's income for 1964, when the restriction lapsed. Income Tax Regs. sec. 1.421-6(d)(2)(i); cf. *Deutsch v. Commissioner,* 405 F.2d 889 (C.A. 9, 1969), affirming per curiam a Memorandum Opinion of this Court"