CHARLES J. HEITZMAN AND SHARON LEE HEITZMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Heitzman v. Commissioner
Docket No. 33436-84.
United States Tax Court
T.C. Memo 1987-109; 1987 Tax Ct. Memo LEXIS 105; 53 T.C.M. (CCH) 241; T.C.M. (RIA) 87109; 94 Oil & Gas Rep. 210; February 24, 1987. Martin N. Gelfand, for *106 the petitioners. Howard Rosenblatt, for the respondent. SHIELDS
MEMORANDUM OPINION SHIELDS, Judge: Respondent determined a deficiency in petitioners' Federal income tax for 1979 of $55,263. The case is before us at this time on a motion by each party for partial summary judgment under Rule 121. [1] The issues raised in each motion are whether petitioners are entitled to a deduction attributable in part to a minimum annual royalty and in part to intangible drilling costs accrued in 1979 by a partnership in which they had an interest. The parties agree that no genuine dispute as to any material fact exists with respect to these issues and that a decision with respect to each issue may be rendered as a matter of law. Petitioners, Charles J. and Sharon Lee Heitzman, husband and wife, resided in Phoenix, Arizona when they filed their petition in this case. Stonehurst Energy Partners
Stonehurst Energy Partners ("Stonehurst"), a California limited *107 partnership, was formed on or about December 10, 1979, for the stated purpose of acquiring, developing and operating oil and gas leases in Oklahoma. Its general partner was Wind River Energy, a Nevada corporation, and its only limited partner at the time of its formation was Ronald Freemond, the president of Wind River. Between December 10, 1979, and December 29, 1979, thirty-five other individuals, including Charles J. Heitzman (hereinafter referred to as "petitioner") purchased 175 limited partnership units in the partnership. Each limited partnership unit cost $6,200.00; $3,100.00 in cash and $3,100.00 by use of a recourse promissory note due on April 1, 1980. On December 29, 1979, Stonehurst entered into a sublease agreement with Craig Natural Resources, Inc. ("Craig") on 340 acres of land located in Nowata County, Oklahoma. Under the sublease Stonehurst as sublessee agreed to pay Craig as sublessor a lease bonus of $10,000.00 and minimum annual royalties as follows: (a) For the first year, the Minimum Annual Royalty shall be SIX THOUSAND SEVEN HUNDRED DOLLARS ($6,700.00) per acre for a total of $2,278,000.00. The Sublessee's obligation to pay the first year Minimum Annual *108 Royalty shall accrue on the execution of this Oil and Gas Sublease. (b) For the second and subsequent years, the Minimum Annual Royalty shall be FIVE THOUSAND NINE HUNDRED DOLLARS ($5,900.00) per acre. The Sublessee's obligation to pay the second and subsequent years' Minimum Annual Royalty shall accrue one year from the date of this Sublease (Anniversary Date) and on each subsequent Anniversary Date. The term "Anniversary Date" shall be the day of the month on which this Oil and Gas Sublease was executed. (c) The Minimum Annual Royalties shall be payable out of sixty-seven percent (67%) of all oil and gas produced from the Subject Properties at the wellhead. Sublessee shall pay in cash any accrued Minimum Annual Royalties remaining unpaid as of the day before the 1994 Anniversary Date. Thereafter, Minimum Annual Royalties must be paid within one year from the date they are incurred. (d) Sublessee shall recoup any and all amounts paid or incurred as Minimum Annual Royalties from Production Royalties required to be paid or incurred under section 3 hereof. (e) No Minimum Annual Royalties shall accrue after the twentieth year of this sublease. (f) So long as payments on *109 the Minimum Annual Royalties are made out of production as provided for herein and except to the extent the Partners have personally assumed primary liability, Sublessor agrees to recover payment on any unpaid Minimum Annual Royalties only out of Partnership assets, and neither the General Partner nor the Limited Partners shall be liable therefor. On or about December 29, 1979, Stonehurst also entered into a turnkey drilling and completion contract and an operating agreement regarding the 340 acres with an entity known as R.H. Energy, Ltd. ("R. H. Energy"). The turnkey drilling contract in which Stonehurst is referred to as Partnership and R. H. Energy as Driller, contained the following terms: 1. Commencement of Operations. Driller shall immediately commence or cause to be commenced operations for the drilling and, if the Partnership elects, the completion of twenty-five (25) oil wells to the Bartlesville zone between 900 and 1,200 feet on the acreage designated as the Subject Properties under that certain Sublease between Craig Natural Resources, Inc., Sublessor and the Partnership, Sublessee. In all events, said operations shall be completed no later than June 30, 1980. *110 Driller shall create said drilling program so that no lease expires before its term due to the failure to drill. Said drilling shall include the cost of a water injection and disposal system necessary to enhance recovery of oil reserves. 2. Turnkey Costs of Drilling and Completion. All costs of drilling, testing, completing, flow lines, storage tanks, separators, heat treaters, and pumping units for all wells to be drilled pursuant to the terms of this Turnkey Contract shall be on a turnkey basis. This turnkey price is applicable regardless of whether the well is completed as an oil well, gas well, or a dual completion. The turnkey basis cost for each well drilled which is a dry hole and is plugged and abandoned shall be TWELVE THOUSAND DOLLARS ($12,000.00) of which 100% shall be incurred for intangible drilling costs (IDC) as defined under Section 263(c) of the Internal Revenue Code. The Turnkey cost for each well drilled which is completed as a producing well shall be thirty-five thousand dollars ($35,000.00) of which twenty-four thousand five hundred dollars (24,500.00) or 70% shall be incurred for intangible drilling costs as defined under Section 263(c) of the Internal Revenue Code *111 . 3. Driller's Right to Payment. Partnership shall be obligated in all events to pay the Turnkey completed well costs on sixteen wells ($560,000.00) and for the Turnkey dry hole costs on the remaining nine wells ($108,000.00) upon the effective date of this Turnkey Contract. Partnership shall be obligated in all events to pay the full cost for all wells completed over and above the first sixteen at such time as the Partnership elects to complete said wells. The Limited Partners of the Partnership shall be required to personally assume primary liability for their pro rata share of the cost of drilling said twenty-five wells and for the completion of sixteen of those wells. 4. Timing of Payment. Payment of the monies due on each well under this Turnkey Contract shall be made as follows: (a) Twelve thousand dollars ($12,000.00) upon notice from the Driller that drilling will commence within five days. (b) Twenty-three thousand dollars ($23,000.00) upon the election of the Partnership to complete any well. In no event shall payment for the drilling and completion of more than twelve wells be due prior to April 15, 1980. On March 14, 1980, R. H. Energy advised Stonehurst *112 that the drilling of wells on the property would commence on March 28, 1980. Documents Executed by Petitioner
Petitioner acquired his limited partnership units in Stonehurst pursuant to a subscription agreement executed by him on December 17, 1979. In the subscription agreement petitioner acknowledged that Stonehurst had no financial or operating history and that there was substantial risk that he would lose his entire investment. Petitioner purchased seven of the 175 limited partnership units which entitled him to a 3.96% share in the partnership's profits and losses. His total price for the seven units was $43,400 of which 50%, or $21,700.00, was paid in cash and the balance was represented by a promissory note due April 1, 1980. In connection with the acquisition, petitioner also executed two assumption agreements. The first, relating to Stonehurst's liability to Craig for the minimum annual royalties, provided in pertinent part as follows: 1. The undersigned hereby personally assumes primary liability for his pro rata share ($9,052 per Unit) of $1,600,000 of the $2,278,000 of Minimum Annual Royalties incurred by the Partnership on execution of the Sublease. *113 2. In the event total production for all wells drilled and completed by November 1, 1980, exceeds the greater of thirty (30) barrels per day or 2 barrels per completed well during a thirty (30) day test in November, 1980 (assuming proration for mechanical difficulties, if any), the undersigned hereby assumes primary liability for his pro rata portion of the Minimum Annual Royalties incurred in 1980, 1981, 1982 and 1983 so that the personally assumed primary liability of all of the Partners in the Partnership will equal $3,300,000 or the full amount of the then incurred but unpaid Minimum Annual Royalties, whichever is less, at the time such Minimum Annual Royalty is incurred. During these years, amounts paid to the Sublessor shall not reduce the resulting personal liability of the undersigned except to the extent the total liability under the Sublease is reduced below the assumed liability. In the event total production from all wells is less than the amount described above, the $3,300,000 amount set forth in this paragraph shall be reduced to $1,600,000, and the $330,000 amounts set forth in paragraphs 3 and 4 below shall be reduced to $160,000. 3. Starting in the calendar *114 year 1984, the first $330,000 of payments made to the Sublessor shall reduce pro rata the personal liability of the undersigned. Additional amounts shall not reduce the personal liability except to the extent the total liability under the Sublease is reduced below the amount on which the Partners are personally liable. 4. The undersigned also hereby agrees to be liable for his pro rata share of that portion of the Minimum Annual Royalties incurred in and from 1984 through and including 1992 so that the total personal liability of all Partners will equal an amount which is $330,000 less than the amount for which all Partners were personally liable immediately after the previous year's Minimum Annual Royalties were incurred. The other assumption agreement related to Stonehurst's liability to R. H. Energy for costs under the turnkey drilling contract. It provided in pertinent part, as follows: 1. The undersigned hereby personally assumes primary liability for payment of any drilling and completion costs incurred on the effective date of the Turnkey Contract to the extent of Three Thousand Seven Hundred Seventy-Nine Dollars ($3,779) for each Unit of Limited Partnership Interest *115 for which the undersigned has subscribed and for which the General Partner has accepted the subscription, and promises to pay such incurred liabilities when due as provided by the Turnkey Contract. 2. The personal liability assumed under paragraph 1 shall be reduced by any amounts paid by or on behalf of the undersigned to Driller against the incurred liability of the Partnership under the Turnkey Contract. 3. Any amount paid by the Partnership to Driller in discharge of any accrued liabilities under the Turnkey Contract shall be attributed to each Partner in the proportion that his capital contribution bears to the total capital contributions of all Partners until all primary personal liability assumed hereby has been discharged. Applicable Returns
For the taxable year 1979, Stonehurst timely filed a U.S. Partnership Return of Income (Form 1065) with the Internal Revenue Service Center at Fresno, California. On its return, Stonehurst, using the accrual method of accounting, reported no income but claimed the following deductions: Minimum Annual Royalty
$2,278,000.00
Intangible Drilling Costs
* 500,000.00
Tax Consultation
4,050.00
Amortization of Organization Costs
219.00
Total Deductions
$2,782,269.00
*116 The balance sheet included in Stonehurst's 1979 return reflects a negative net worth of approximately $1.7 million at the partnership's year end. For the taxable year 1979, petitioners timely filed a joint income tax return with the Internal Revenue Service Center at Fresno, California. On their return, they claimed a loss from the Stonehurst partnership in the amount of $110,170.00, being 3.96 percent of the deductions claimed on the partnership return. In his statutory notice respondent disallowed that portion of the loss which is attributable to the minimum annual royalty and the intangible drilling costs. Are Petitioners Entitled to Deduct their Pro Rata Portion of the Minimum Annual Royalty for 1979?
The parties agree that Stonehurst properly accrued the minimum royalty in 1979 [2]. They disagree, however, as to whether such accrual gives rise to a tax deduction in 1979 under section 1.612-3(b)(3), Income Tax Regs., which reads in pertinent part as follows: The payor shall treat the advanced royalties paid *117 or accrued in connection with mineral property as deductions from gross income for the year the mineral product, in respect of which the advanced royalties were paid or accrued, is sold. For purposes of the preceding sentence, in the case of mineral sold before production the mineral product is considered to be sold when the mineral is produced (i.e., when a mineral product first exists). However, in the case of advanced mineral royalties paid or accrued in connection with mineral property as a result of a minimum royalty provision, the payor, at his option, may instead treat the advanced royalties as deductions from gross income for the year in which the advanced royalties are paid or accrued. See section 446 (relating to general rule for methods of accounting) and the regulations thereunder. For purposes of this paragraph, a minimum royalty provision requires that a substantially uniform amount of royalties be paid at least annually either over the life of the lease or for a period of at least 20 years, in the absence of mineral production requiring payment of aggregate royalties in a greater amount. * * * [Emphasis added.] *118 The deduction of the minimum royalty for 1979, being an advanced royalty since it was accrued before any production occurred, is obviously governed by the above regulation which provides that as a general rule the deduction of an advanced royalty is postponed until the mineral upon which the royalty is based is produced and sold. However, the regulation contains an exception which permits a royalty accrued pursuant to a "minimum royalty provision" to be deducted in the year in which the royalty is accrued. Since no oil or gas was produced in this case in 1979, to prevail petitioner must fall under the exception by showing that the royalty was accrued pursuant to a minimum royalty provision within the meaning of the regulation. We have previously determined in several cases what constitutes a "minimum royalty provision" under section 1.612-3(b)(3). See, e.g., Capek v. Commissioner,86 T.C. 14 (1986); Vastola v. Commissioner,84 T.C. 969 (1985); Wing v. Commissioner,81 T.C. 17 (1983). In Capek, we held that to constitute a minimum royalty provision under the regulation the applicable instrument (the sublease in this case) *119 must require the payment of a substantially uniform amount of royalties at least annually. 86 T.C. at 41. In other words, the provision cannot permit the deferral of payment of the minimum annual royalty. There must be an enforceable obligation to make a substantially uniform payment each year. Oneal v. Commissioner,84 T.C. 1235, 1241 (1985). In the case before us, the sublease between Stonehurst and Craig requires only the accrual of a minimum annual royalty. No payment of the accrued minimum royalties is required in the absence of production until December 29, 1994. It is clear, therefore, that the sublease does not contain a minimum royalty provision within the meaning of the regulation; and therefore respondent's disallowance of petitioners' deduction with respect to the minimum royalty for 1979 is correct. In reaching our conclusion we have considered but cannot adopt petitioners' argument that since the Stonehurst partners were personally liable for the minimum royalties, the sublease in effect provided for guaranteed minimum royalties and thus satisfied the regulation. In support of this contention, petitioners point to Vastola, where *120 we noted by way of dictum that an accrual basis taxpayer could make a strong argument that the regulation should be interpreted to include a provision requiring the payment of royalties with the execution of recourse promissory notes. 84 T.C. at 979. However, any weight attributable to this dictum was removed by our subsequent decision in Capek, where the provision at issue permitted the payment of the minimum royalty with a recourse note payable after the end of the taxable year. Applying the same principles discussed above, we concluded that "[e]ven assuming that petitioners would eventually pay the notes, payment after the close of the taxable year does not satisfy the requirement of the regulation that the royalties be paid at least annually over the term of the lease." 86 T.C. at 47. Consequently, we find that the sublease agreement did not contain a minimum royalty provision; thus, petitioners are not entitled to a deduction for the minimum royalty accrued in 1979. Are Petitioners Entitled to Deduct in 1979 their Pro Rata Portion of the Intangible Drilling Costs?
The answer to this issue turns on whether Stonehurst was entitled to accrue *121 such costs in 1979 under the turnkey drilling contract entered into with R. H. Energy on December 29, 1979. In that contract, R. H. Energy agreed to drill 25 oil wells by June 30, 1980. In return Stonehurst agreed to pay $12,000 for each well which turned out to be a dry hole and $35,000 for each well which Stonehurst elected to complete and place in production. The contract clearly provided that with respect to each well Stonehurst was to pay $12,000 to R. H. Energy upon being advised that drilling would commence on that well within five days and that with respect to any well which Stonehurst elected to complete an additional $23,000 was payable to R. H. Energy when such election was made. Since Stonehurst did not receive any notice that drilling was to commence until March of 1980 it is apparent that all the events which determined its liability for any drilling costs did not occur until after the end of 1979. Consequently, no part of the drilling costs is accruable in 1979. Section 1.461-1(a)(2), Income Tax Regs. See also Shepherd Construction Co. v. Commissioner,51 T.C. 890 (1969). Petitioners contend, however, that under the first sentence in paragraph *122 3 of the agreement Stonehurst was specifically made liable "in all events" for the turnkey cost of 16 completed wells at $35,000 each and for the dry hole cost of 9 wells at $12,000 each for a total of $668,000 ($560,000 + $108,000) of which $500,000 represented the intangible drilling costs ($108,000 + $392,000 being 70% of $560,000) which were accrued and deducted on Stonehurst's 1979 return. We cannot agree because from the agreement as a whole the conclusion is inescapable that Stonehurst had no liability for any drilling costs with respect to any well until notified that drilling would commence within five days. Upon receipt of such notice, Stonehurst would be liable for $12,000 and if it later elected to complete the well it would be liable for an additional $23,000. This construction is apparent from the second sentence in paragraph 3 of the agreement as well as from subparagraphs (a) and (b) of paragraph 4. From all of the foregoing we conclude as a matter of law that petitioners are not entitled to deduct in 1979 their pro rata share of the minimum annual royalty and the intangible drilling costs claimed by Stonehurst on its 1979 return and that respondent's motion should *123 be granted and petitioners' motion denied. An appropriate order will be entered.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure unless otherwise provided.↩
*. The $500,000 was computed as follows: ↩
16 wells at $35,000 X 70%
=
$392,000
9 wells at $12,000
=
108,000
Total
$500,000
2. In other words, there is no dispute that in 1979 Stonehurst became liable for $2,278,000 in royalties.↩