APPLE COMPUTER, INC. AND CONSOLIDATED
SUBSIDIARIES, PETITIONER *v.*
COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket No. 34127-87.          Filed March 3, 1992.

*Glenn A. Smith, William W. Koopman,* and *Eric D. Ryan,* for petitioner.

*William E. Bonano* and *Mary E. Wynne,* for respondent.

OPINION

JACOBS, *Judge:* Respondent determined deficiencies in the consolidated income tax of Apple Computer, Inc. and Consolidated Subsidiaries for their 1981, 1982, and 1983 fiscal years. The parties filed cross-motions for partial summary judgment pursuant to Rule 121.[1]  Summary judgment is appropriate if the pleadings and other materials show that there is no genuine issue as to any material fact and a decision may be rendered as a matter of law.  Rule 121(b).  The parties agree, and the record reveals, that there is no genuine issue as to any material fact.   Therefore, partial summary judgment is appropriate.

---

[1]All section references are to the Internal Revenue Code in effect for the periods in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The question for summary adjudication, and the only question addressed in this opinion, is whether income generated upon the exercise of nonstatutory employee stock options constitutes wages paid or incurred for qualified services in calculating the credit for increasing research activities under section 44F, now section 41.

For purposes of the cross-motions, certain facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated by this reference.

Apple Computer, Inc. (hereinafter referred to as petitioner) is a California corporation with a principal place of business in Cupertino, California. During the periods in issue, petitioner reported income on a fiscal year basis using the accrual method of accounting. Since its incorporation on January 3, 1977, petitioner has designed, produced, marketed, and serviced computer and computer-related products.

Petitioner made its first public offering of stock in December 1980. Since that time, petitioner's common stock has been publicly held and listed on the National Association of Securities Dealers Automatic Quotation System.

During the periods in issue, petitioner maintained three employee stock option plans. Petitioner's board of directors adopted the first plan in July 1978 (the 1978 plan). Options covering 12,154,400 shares of common stock were granted under the 1978 plan, which petitioner's board of directors terminated in December 1979 as to future stock option grants.

Petitioner's board of directors adopted a second stock option plan in December 1979 (the 1979 plan). Petitioner granted options covering 5,187,200 shares of common stock under the 1979 plan, which was terminated in November 1980 as to future stock option grants.

In October 1980, petitioner's board of directors adopted a third stock option plan (the 1980 plan) reserving 1,500,000 shares of petitioner's common stock for issuance upon exercise of options granted under the 1980 plan. The only options at issue herein are the nonstatutory stock options granted under the 1978, 1979, and 1980 plans.

A committee of petitioner's board of directors selected the employee/recipient of the stock options based principally upon the value of the employee's past services and the value of the employee's continued employment with petitioner.

The options typically vested incrementally over a 4-year period beginning on the date of grant. The typical vesting schedule was as follows:

| Years from option grant date | Cumulative percentage of options vested |
|---|---|
| 1 | 25% |
| 2 | 50 |
| 3 | 75 |
| 4 | 100 |

An employee exercised the option by giving written notice to petitioner and paying the option price for the shares. The option price, i.e., the price at which the option could be exercised, was generally set at the fair market value of the stock on the date the option was granted. When the employee exercised the option, petitioner treated the excess of the fair market value on the exercise date over the option price (spread) as wages. If the employee's earnings were sufficient, petitioner withheld employment taxes based on the amount of the spread. If the employee's earnings were insufficient, petitioner required the employee to pay the employment taxes to petitioner. Petitioner reported the spread as wages on the employee's Form W-2 wage statement for the year of exercise.

The spreads at issue arose because of the increase in petitioner's stock price between the time petitioner granted the options and the time the options were exercised. The increases in stock price were extremely large for a significant portion of the options at issue. For example, for 21.56 percent of the options exercised during petitioner's 1982 fiscal year, the increases ranged from 15,985 percent to 23,447 percent. The increases for 36.60 percent of the options exercised during petitioner's 1982 fiscal year ranged from 7,467 percent to 10,800 percent. Similarly, the increases for 34.85 percent of the options exercised during petitioner's 1983 fiscal year ranged from 10,000 percent to 28,933 percent.

Petitioner did not report the spreads at issue as costs or expenses for financial reporting purposes. Accounting Principles Board Opinion No. 25 provides that the spread arising from the exercise of a nonqualified stock option, which was issued for an amount at least equal to the quoted market price on the issuance date, is not a cost or expense under generally accepted accounting principles.

Petitioner deducted the spreads as wages under section 174, and claimed the spreads as wages for purposes of the credit for increasing research activities under section 44F. Respondent allowed the deduction for the spreads under section 162, but disallowed a credit for the following amounts asserting that the spreads were not wages for purposes of the section 44F credit:

| TYE | Amount disallowed |
|---|---|
| Sept. 24, 1982 | $12,159,797 |
| Sept. 30, 1983 | 20,961,033 |

Petitioner concedes that the following credit amounts were properly disallowed because the employee/option holders were not engaged in qualified services:

| TYE | Amount conceded |
|---|---|
| Sept. 24, 1982 | $986,523 |
| Sept. 30, 1983 | 2,507,015 |

All of the spreads at issue for petitioner's 1982 fiscal year, and over 94 percent of the spreads at issue for petitioner's 1983 fiscal year, arose from options granted before the July 1, 1981, effective date of section 44F.

In determining the propriety of the claimed credit, we must decide: (1) Whether the spreads constitute wages under section 44F; (2) whether petitioner paid or incurred the spreads; (3) whether expenses incurred in a year after the year in which services were performed qualify for the credit; and (4) whether the spreads arising from options granted before the enactment of section 44F qualify for the credit.

(1) *Wages for Qualified Services*

Section 44F(a) authorizes a credit of 25 percent of the excess (if any) of (1) the qualified research expenses for the taxable year, over (2) the base period research expenses. Qualified research expenses are defined as those in-house research expenses and contract research expenses which the taxpayer paid or incurred during the taxable year. Sec. 44F(b)(1). Base period research expenses are defined as the average of the qualified research expenses which the taxpayer paid or incurred in the 3 years immediately preceding the year in which the credit is claimed. Sec. 44F(c).

In-house research expenses include "any wages paid or incurred to an employee for qualified services performed by such employee." Sec. 44F(b)(2)(A)(i). Pursuant to section 44F(b)(2)(D)(i), "The term 'wages' has the meaning given such term by section 3401(a)." Section 3401(a) provides that unless specifically excluded, "'wages' means all remuneration * * * for services performed by an employee for his employer, including the cash value of all remuneration paid in any medium other than cash".

The parties agree that the employees who exercised the options at issue were engaged in qualified services at the time the options were granted and during the year the options were exercised. The parties dispute whether the spreads constitute wages under section 44F(b)(2)(A)(i).

Section 44F defines the term "wages" by referring to the section 3401(a) definition of wages. Respondent concedes that the spreads at issue constitute wages under section 3401(a).[2]

Respondent argues that Congress did not intend to include the spreads in the section 44F definition of wages. In essence, respondent asserts that even though Congress used the section 3401(a) definition of wages to define wages under section 44F, Congress would have excluded the spreads from the section 44F definition if it had been aware that spreads were wages under section 3401(a). We disagree.

The legislative history of section 44F indicates that Congress carefully considered the definition of wages. The House report states:

> the term "wages" has the same meaning as provided in section 3401(a) for purposes of employee wage withholding. Thus, amounts of compensation which are not subject to withholding, such as certain fringe benefits, do not enter into the credit computation even though paid for services in performing research. * * * [H. Rept. 97-201 (1981), 1981-2 C.B. 352, 361.]

Further, under section 83, which was enacted prior to section 44F, the holder of a nonstatutory employee stock option (which did not have a readily ascertainable fair market value at grant) was required to recognize compensation income (and

---

[2]Courts have long recognized that unless the receipt of a nonstatutory employee stock option gives rise to taxation at grant, the spread upon exercise of the option constitutes compensation for services that is includable in the employee's gross income. *Commissioner v. LoBue,* 351 U.S. 243, 247 (1956); *Lighthill v. Commissioner,* 66 T.C. 940, 946-948 (1976).

the employer could claim a deduction under section 162 for such compensation income) at the time the holder received property pursuant to either the exercise or the disposition of the option. Sec. 83(e)(3) and (4), (h); secs. 1.83-1(a), 1.83-6, 1.83-7(a), Income Tax Regs.;[3] see also *Pagel v. Commissioner,* 905 F.2d 1190, 1191 (8th Cir. 1990), affg. 91 T.C. 200 (1988); Rev. Rul. 67-257, 1967-2 C.B. 359, 360. Thus, at the time Congress enacted section 44F, section 83 as well as the regulations provided that spreads were compensation income. We therefore cannot conclude that Congress did not understand that spreads were wages under section 3401(a). Accordingly, the spreads at issue constitute wages under section 3401(a) and thus wages under section 44F(b)(2)(A)(i).

Respondent essentially asks us to draft an exception to the section 44F definition of wages. Respondent argues that the spreads should not qualify for the credit because Congress intended the credit to be an incentive to increase research spending and petitioner's spreads bore no relation to increased research spending. Respondent adds that the spreads arose as a result of the fortuities of the market for petitioner's stock.

If our mission were to redraft section 44F, we might agree with respondent and exclude spreads from the definition of wages. However, our mission is only to interpret section 44F. We cannot find any language in section 44F or its legislative history which permits us to interpret section 44F to exclude spreads from the definition of wages.[4]

## (2) *Expenses Paid or Incurred*

Respondent argues that petitioner did not pay or incur any costs or expenses under section 44F(b)(2)(A)(i) when the employees exercised their stock options. The term "paid or incurred" must be construed according to the method of accounting which the taxpayer used to compute taxable income. Sec. 7701(a)(25). Thus, the presence of this term in

---

[3]Under sec. 83, if an option has a readily ascertainable fair market value at the time of its grant, the option holder recognizes income upon receipt of the option. *Pagel v. Commissioner,* 905 F.2d 1190, 1191 (8th Cir. 1990), affg. 91 T.C. 200 (1988); sec. 1.83-7(a), Income Tax Regs. Implicit in the parties' arguments is their agreement that the options did not have readily ascertainable fair market values at the time of their grant.

[4]If petitioner has found a hole in the tax dike, the problem must be corrected by applying the thumb of Congress, not the Court's. *Fabreeka Products Co. v. Commissioner,* 294 F.2d 876, 879 (1st Cir. 1961), vacating and remanding 34 T.C. 290 (1960).

provisions allowing deductions or credits reveals Congress' general intent to give full meaning to both the cash receipts and disbursements method of accounting and the accrual method of accounting. *Don E. Williams Co. v. Commissioner,* 429 U.S. 569, 574 (1977).

Petitioner used the accrual method of accounting in computing its taxable income. Generally, an accrual method taxpayer deducts expenses in the year in which they are incurred regardless of when they are actually paid. *Heitzman v. Commissioner,* 859 F.2d 783, 787 (9th Cir. 1988), affg. T.C. Memo. 1987-109. Expenses are not deemed "incurred", however, until all events that determine the fact of liability have occurred and the amount of the liability can be determined with reasonable accuracy. *Heitzman v. Commissioner, supra;* sec. 1.461-1(a)(2), Income Tax Regs.

Stock options are offers to sell stock at a stated price for a stated period of time. See sec. 1.421-7(a)(1), Income Tax Regs. Pursuant to the 1978, 1979, and 1980 plans, an employee could accept the offer by giving written notice of acceptance and tendering the exercise price during the option term. When the employee accepted petitioner's offer, petitioner became obligated to convey stock, and was entitled to a deduction under section 162. Sec. 83(h). Thus, we hold that petitioner incurred a liability or expense when each option was exercised.

Respondent's argument does not focus on petitioner's use of the accrual method. Rather, respondent contends that petitioner did not pay any cash or incur any liabilities upon the grant or exercise of the option. However, there is no requirement that an expense must be paid in cash (as opposed to property), and as previously stated, petitioner incurred a liability when each option was exercised.

Our holding that petitioner incurred an expense when each option was exercised is consistent with Rev. Rul. 67-257, 1967-2 C.B. 359, 360. That revenue ruling provides that pursuant to section 3402, income tax must be withheld from the spreads generated upon the exercise of nonstatutory stock options which did not have readily ascertainable fair market values at grant. The revenue ruling first cites section 3402(a)(1) which states that "every employer making payment of wages shall deduct and withhold upon such wages a tax". The revenue ruling then cites section 31.3402(a)-(1)(c), Employment Tax

Regs., which provides that it is immaterial whether wages are paid in something other than money. After stating that the option spreads are wages under section 3401(a), the revenue ruling concludes that the spreads were payments for purposes of income tax withholding. Rev. Rul. 67-257, 1967-2 C.B. 359, 360. Thus, in the instant case, respondent's argument that petitioner did not pay an expense is contrary to her own ruling which implicitly concludes that wages are paid with stock when a nonstatutory stock option is exercised.

Respondent also argues that pursuant to Accounting Principles Board Opinion No. 25, the spreads were not expenses for Federal income tax purposes because they were not treated as expenses for financial reporting.[5] Respondent is essentially arguing that financial accounting conventions should control Federal income tax laws.

The Supreme Court has rejected this argument:

The court has long recognized "the vastly different objectives that financial and tax accounting have." The goal of financial accounting is to provide useful and pertinent information to management, shareholders, and creditors. On the other hand, the major responsibility of the Internal Revenue Service is to protect the public fisc. * * * [*United States v. Hughes Properties, Inc.,* 476 U.S. 593, 603 (1986); citations omitted.]

The Supreme Court has also stated that a presumptive equivalency between tax and financial accounting would create insurmountable difficulties in tax administration. *Thor Power Tool Co. v. Commissioner,* 439 U.S. 522, 544 (1979). Thus, respondent's reliance upon generally accepted accounting principles is misplaced.

(3) *Expenses Incurred After Services Performed*

Respondent maintains that Congress intended that for expenses to qualify for the credit, the expenses must be paid or incurred for qualified services performed during the taxable year. As statutory authority for her argument, respondent points to section 44F(b)(3)(B).

Section 44F(b)(3)(B) provides in part:

---

[5]Petitioner disputes whether Accounting Principles Board (APB) Opinion No. 25 should be considered persuasive in light of the Financial Accounting Standards Board's numerous reports drawing the conclusion of APB Opinion No. 25 into question. We do not find it necessary to resolve whether APB Opinion No. 25 is an accurate description of the generally accepted accounting principles concerning nonstatutory stock options.

If any contract research expenses paid or incurred during any taxable year are attributable to qualified research to be conducted after the close of such taxable year, such amount shall be treated as paid or incurred during the period during which the qualified research is conducted.

Thus, in the context of contract research expenses, when computing the credit, certain prepaid or preincurred expenses are deemed paid or incurred in the year the qualified research is conducted. Sec. 44F(b)(3)(B). Respondent asks us to interpret section 44F(b)(3)(B) in a manner which would disregard wage expenses incurred in years other than the year in which the research was performed. We refuse to do so.

The plain language of section 44F(b)(3)(B) deems certain prepaid or preincurred contract research expenses as paid or incurred during a different taxable year. Respondent's argument assumes that if Congress had omitted section 44F(b)(3)(B), then prepaid or preincurred expenses would not qualify as qualified research expenses. In other words, respondent contends that section 44F(b)(3)(B) allows expenses which would not otherwise ever qualify for the credit to qualify in the year the research is performed. The unambiguous language of section 44F(b)(3)(B), however, simply changes the taxable year in which the expense is deemed paid or incurred.

Respondent also cites section 44F(b)(2)(B) in support of her argument that to qualify as a qualified research expense, the expense must be paid or incurred in the year the research was performed. Section 44F(b)(2)(B) provides, in part:

If substantially all of the services performed by an individual for the taxpayer during the taxable year consists of services meeting the requirements of clause (i) or (ii), the term "qualified services" means all of the services performed by such individual for the taxpayer during the taxable year.

The meaning of this provision is clear. On an annual basis, if an individual's services consist substantially of qualified services, then all of the individual's services are treated as qualified services. Section 44F(b)(2)(B) speaks solely to the characterization of services as either nonqualified or qualified services, an issue that the parties do not dispute.

Finally, respondent argues that the legislative history of section 44F supports her contention that qualified research expenses are only those paid or incurred in the years the services were performed.

The Supreme Court has recently stated:

When we find the terms of a statute unambiguous, judicial inquiry is complete except in rare and exceptional circumstances. We do not believe that this is one of those rare cases where application of the statute as written will produce a result "demonstrably at odds with the intentions of its drafters." * * * [*Demarest v. Manspeaker*, 498 U.S. 184, ___, 111 S. Ct. 599, 604 (1991); citations omitted.]

Similarly, the Ninth Circuit, the circuit to which an appeal in the instant case lies, has held that:

In construing a statute, we must first look to the plain language used by Congress. If the language of the statute is unambiguous, it is conclusive unless there is a "clearly expressed legislative intention to the contrary. . . ." * * * [*United States v. Hurt*, 795 F.2d 765, 770 (9th Cir. 1986); citations omitted.]

The legislative history does not contain a clearly expressed intention that expenses do not qualify for the credit unless paid or incurred in the year the services were performed. The legislative history comports entirely with the plain meaning of section 44F(b)(2)(B) and section 44F(b)(3)(B). Thus, we reject respondent's argument that these provisions should be interpreted as requiring services to be paid or incurred in the year of performance.

(4) *Options Granted Before the Enactment of Section 44F*

Respondent argues that spreads attributable to options granted before the effective date of section 44F should not qualify for the credit. The effective date provision for section 44F states: "The amendments made by this section shall apply to amounts paid or incurred after June 30, 1981, and before January 1, 1986." Economic Recovery Tax Act of 1981, Pub. L. 97-34, sec. 221(d)(1), 95 Stat. 247. As discussed previously, the expenses were incurred when the employees exercised the options. All of the options at issue were exercised after June 30, 1981, and before January 1, 1986. Hence, all of the spreads at issue qualify for the credit under section 44F.

To reflect the foregoing,

*An appropriate order will be issued.*