T.C. Memo. 1997-413


UNITED STATES TAX COURT


SHARON LEE BARTLETT, F.K.A. HEITZMAN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 33938-84.                Filed September 17, 1997.


<u>William R. Harper</u>, for petitioner.

<u>Russell F. Kurdys</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

BEGHE, <u>Judge</u>:  Respondent determined a deficiency of $55,263
in petitioner's 1979 Federal income tax.  The sole issue is
whether petitioner is entitled to innocent spouse relief under
section 6013(e).[1]  We hold that she is so entitled.

---

[1] All section references are to the Internal Revenue Code in
effect for the year in issue, and all Rule references are to the
Tax Court Rules of Practice and Procedure, unless otherwise
indicated.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioner was a resident of Woodbridge, New Jersey, when she filed her petition.

The parties stipulated to the inclusion in the record of this case of the opinions of this Court and of the Court of Appeals for the Ninth Circuit in Heitzman v. Commissioner, T.C. Memo. 1987-109, affd. 859 F.2d 783 (9th Cir. 1988), and of the parties' briefs in this Court, but not to the truth of any matters asserted therein. On September 9, 1986, prior to this Court's granting summary judgment in favor of respondent in Heitzman v. Commissioner, supra, the parties stipulated that if petitioner's former husband, Charles J. Heitzman, paid the entire tax liability at issue in Heitzman v. Commissioner, supra, plus interest, then petitioner would be discharged from that liability. Petitioner also agreed to be bound by the outcome of that case regarding substantive tax liability but reserved the right to claim innocent spouse status under section 6013(e).

1. Background

When petitioner married for the first time at age 17, she had completed the 11th grade. Petitioner had two children from her first marriage, which ended in divorce. In June 1973, petitioner married Mr. Heitzman, a widower with one child. Petitioner and Mr. Heitzman were residents of Hawaii throughout

their marriage, from 1973 until 1982. In 1982, Mr. Heitzman moved to Phoenix, Arizona, to pursue a business development opportunity with a startup company called Autocast, which had been formed to manufacture concrete products for the housing industry. In 1983, petitioner and Mr. Heitzman were divorced. They had no children together.

In 1975, Mr. Heitzman and petitioner bought a house in Honolulu, which served as their residence. It was their only joint investment during their marriage. Mr. Heitzman made all his other investment decisions without input from petitioner. Although petitioner worked part time as a model and received residuals from the Screen Actors Guild in 1979 for a television commercial, Mr. Heitzman was the primary breadwinner. In 1979, Mr. Heitzman was employed by TSI Corporation as a real estate developer. He was also general partner in DMA Heitzman, which developed condominium projects.

Petitioner made no independent investments during her marriage. In 1975, petitioner completed her high school education by obtaining her General Education Diploma. Petitioner never took any accounting or bookkeeping courses.[2]

---

[2] Petitioner's only other training was two real estate sales workshops she took in preparation for an attempt to become a real estate agent. Petitioner failed the licensing examination the first time partly because of her inadequate arithmetic skills. On her second attempt, she passed the exam. Aside from the sale of a condominium, the listing for which was given to her at Mr. Heitzman's behest, petitioner never participated in the sale of any real estate as a real estate agent. Petitioner did not find
(continued...)

Petitioner was the homemaker and primary caregiver for her two sons and Mr. Heitzman's son. Mr. Heitzman provided her a monthly allowance for household expenses that grew over the years to approximately $1,500 per month. In 1979, the monthly allowance was less than $1,500. Mr. Heitzman also bought petitioner gifts throughout their marriage in a pattern that did not change until they separated in 1982.

On September 5, 1979, Mr. Heitzman contracted with Frank S. H. Kwon Home Builders to remodel the kitchen and master bedroom of the family residence. Work was completed on October 16, 1979. Costs rose to $41,191 from the original estimate of $29,224. The bulk of funds used to pay for remodeling the residence came from a loan from the Bank of Hawaii. The record does not reflect the source of funds used to repay the loan or whether the loan was ever repaid. There were loans outstanding to the Bank of Hawaii when petitioner and Mr. Heitzman were divorced in April 1983. Mr. Heitzman assumed the obligation to repay these loans as part of the divorce settlement. In 1979, petitioner used her separately earned income to make other improvements to the house, including installing a parquet floor in the bedroom of Mr. Heitzman's son.

The remodeling had little or no long-term effect on the value of the house. In the early 1980's, and continuing through

---

[2](...continued)
the buyer for the condominium. Her role in the sale was restricted merely to observing the contract negotiations.

the time of trial, the Hawaii housing market was driven by two major factors:  Location and the underlying quality of the structure.  The prime location of the house and its high quality workmanship caused its value to rise throughout this period until Mr. Heitzman and petitioner sold it in 1982.

Since 1983, petitioner has been employed as a flight attendant.

2.  <u>Stonehurst Energy Partners</u>

Ronald Freemond, president and sole shareholder of Wind River Energy, Inc. (Wind River), a Nevada corporation, formed Stonehurst Energy Partners (Stonehurst) on December 10, 1979, to engage in the  development, drilling, and operation of oil wells. Wind River was the general partner, and Freemond was the initial limited partner.  Freemond had organized Wind River to be general partner of Stonehurst.  Although Freemond had "substantial experience in financial planning and tax advantaged investment", he and Wind River had "no experience in drilling for oil and gas."

Between December 10 and December 29, 1979, Mr. Heitzman and 34 other individuals purchased a total of 175 limited partnership units in Stonehurst at a cost of $6,200 per unit and a total investment of $1,085,000.  Investors paid $3,100 in cash on the purchase of each unit and $3,100 with a recourse promissory note due April 1, 1980.

Wind River was to receive 12 percent of the capital invested in Stonehurst as an "Initial Management Fee", and an overriding production royalty of 6.9 percent of gross revenues from Craig Natural Resources, Inc. (Craig), the sublessor of the land and named obligee of the minimum annual royalties, described infra pp. 6-8. Craig also was to receive 8 percent of the initial capital invested in Stonehurst as a "consulting fee".

a. The Stonehurst Private Placement Memorandum

The Stonehurst Energy Partners Private Placement Memorandum (the Memorandum) represented that the partnership "intends to engage in acquiring, drilling and possibly completing twenty-five (25) or more shallow Developmental Oil Wells in northeastern Oklahoma." The Memorandum characterized these wells as having more limited prospects of discovering and exploiting "significant reserves of oil and gas in relation to the capital committed * * * although bearing less risk" than the drilling of exploratory wells in a relatively unproven area or formation. The Memorandum stated that the partnership "does not presently intend to engage in the drilling of any Exploratory Wells", while on another page, it emphasized the "high degree of risk of loss" involved in "exploration" for oil and gas, and offered no assurances that investors would recover their capital contributions. The Memorandum stated that the offering would be restricted to individuals who had annual income sufficient to incur Federal income tax liability at the rate of 50 percent.

b.  <u>Minimum Annual Royalties</u>

On December 29, 1979, Stonehurst entered into a sublease agreement with Craig for a 100-percent working interest in oil, gas, and mineral rights to 340 acres in Nowata County, Oklahoma. The working interest was restricted to the "Bartlesville Sands formation, the principal producing zone in the area" and "<u>no other</u> oil, gas or mineral rights in the subject property".  R.H. Energy, Ltd. ("R.H. Energy"), the driller/operator under the turnkey contract, see <u>infra</u> p. 8, concurrently was to assign its mineral rights in this land to Craig.

Stonehurst, as sublessee, agreed to pay Craig, as sublessor, a production royalty of 67 percent of gross revenue from the sale of oil and gas.  Stonehurst was obligated to pay a lease bonus of $10,000, and minimum annual royalties of $2,278,000 for 1979, and $2,006,000 for each year thereafter through 1994, for a total of $30,362,000, accruing on December 29 of each year, to be recouped from the production royalty prior to any expenses' being paid by Stonehurst.  In the absence of production, payment of all royalties was deferred until December 29, 1994.  All minimum annual royalties accrued but unpaid on that date were then to be paid in cash by Stonehurst to Craig.  Minimum annual royalties accruing thereafter were to be paid within 1 year of accrual. Both the general and limited partners of Stonehurst were relieved of any liability associated with the accrued but unpaid royalties

unless they had assumed personal liability for them.  No interest was payable on the unpaid accruals.

Recoupment from the 67-percent production royalties of full payment of the $30,362,000 of minimum annual royalties projected to be accrued by Stonehurst through 1994 would have required an average price per barrel of oil between $58.93 and $86.11 over the course of the lease at the levels of production assumed by the economic projections in the Memorandum.  Stonehurst could avoid liability for all or a proportionate part of the minimum annual royalties not yet accrued by surrendering its rights under the sublease to the entire leased property or to any parcel of 6 contiguous acres or more prior to the beginning of the next lease year.

c.  <u>Turnkey Contract</u>

On December 29, 1979, Stonehurst also entered into a "turnkey and drilling completion contract" with R.H. Energy for 25 wells to be completed by June 30, 1980.  The Memorandum described R.H. Energy as a joint venture between H.H. Oil & Gas Co., a Colorado based corporation, and Synergistics Equities, Ltd.  The Memorandum indicated that there was a relationship between R.H. Energy and Craig that gave rise to a possible conflict of interest between R.H. Energy and Wind River concerning R.H. Energy's recommendations to Craig about whether to complete drilling on any wells, inasmuch as incomplete wells would eventually be forfeited back to R.H. Energy.  This possible

conflict relationship was also the subject of part of the legal opinion rendered by the law firm of Meserve, Mumper & Hughes, which was included as an exhibit in the Memorandum. See infra p. 14.

Under the turnkey contract, Stonehurst was obligated to pay R.H. Energy $12,000 per dry well and $35,000 per well put into production. An initial payment of $12,000 per well was due to R.H. Energy upon notice that drilling would commence within 5 days. No such notice was given in 1979. In March 1980, R.H. Energy gave notice to Stonehurst that drilling of wells on the property was about to commence.

### d. Economic Analysis and Predicted Tax Benefits of Stonehurst

The Memorandum presented two economic projections that purported to show significant tax losses in the early years of Stonehurst's operations and distributions of profits in the later years. Because no production or revenue was projected for the initial year, 1979, the tax loss shown for that year was identical under both projections, amounting to $2,788,000.[3] The

---

[3] The components of this figure are:

| Item | Amount |
|---|---|
| Accrued minimum annual royalty | $2,278,000 |
| Accrued intangible drilling costs | 500,000 |
| Operating costs | 10,000 |
| Total | 2,788,000 |

beginning aggregate "at risk exposure" of the limited partners for 1979 was $2,821,500. Their 1979 ending aggregate "at risk exposure" was $33,500, after deduction of the 1979 tax loss shown for each limited partner.[4] The Memorandum estimated aggregate tax savings to the limited partners of $1,394,000 for 1979 based upon a marginal tax rate for individuals of 50 percent. The Memorandum reported that the "tax loss" to be generated in 1979 was leveraged 5.09 times "with respect to the Initial Cash Contribution".

Each economic projection expressly relied upon the stated assumption that 89 percent of a total of 55 wells drilled between 1980 and 1983 would produce oil in the quantities assumed in that projection. The cover letter to a geological report, discussed below, and included as an exhibit to the Memorandum, stated that "Realistically a 90% success ratio should be anticipated." Projection A assumed total production of 757,500 barrels of oil from 1980 to 1994 at declining rates of production of 5, 4, and 3 barrels per day per well in the first 3 years and 3 barrels per day thereafter.[5] Projection B assumed production rates of half those of projection A.

---

[4] Mr. Heitzman's claimed deduction of $110,170 on the 1979 return was derived from his share of the total losses (7 of 175 units), $2,788,000 less the remaining "at risk exposure", $33,500.

[5] Compare with the Coburn report, infra p. 12, which makes a somewhat different assumption: an initial production rate of 5 barrels per day, declining to 3 barrels per day within 24 months.

Both projections were also based upon a price per barrel of oil of $32.50 in 1980 that would increase at a compounded annual rate of 10 percent per year through 1994. The Memorandum projected that the price of oil in 1994 would be $123.44 per barrel. Operating costs were also projected to increase at 10 percent per year over the term of the lease.

e. Coburn Geological Report

The Memorandum included a geological report, signed by R. W. Coburn (hereinafter Coburn report), which identified Mr. Coburn as a registered Oklahoma petroleum engineer. The Coburn report asserted that Stonehurst could expect 90 percent of its wells to produce oil. However, the report does not make clear whether this likelihood pertained to developmental drilling of known formations or exploratory drilling in new fields.[6] The economic projections described supra explicitly rested upon the 90-percent success rate.

The Coburn report asserted that "commercial oil production can be obtained from the Bartlesville Sand", which it said was "the principal producing zone" in Nowata County. The assertion about obtaining commercial oil production was uncorroborated by any supporting geological data, such as log data, seismic data, or gravity surveys. The lack of any such data supporting the

---

[6] One section of the report refers to "shallow oil exploration" while another section refers to "proposed development". This same inconsistency is also found in the Memorandum. See supra p. 6.

presence of Bartlesville Sand in the immediate area is critical because the geological structure of Bartlesville reservoirs may vary greatly in thickness and reservoir quality over short distances.[7]  Because developmental drilling occurs only in known formations, the drilling programs proposed by the Coburn report and the Memorandum could only have been exploratory, inasmuch as the nearest actual oil production in the preceding 40 years had occurred some 8 miles away from the Stonehurst leasehold. Exploratory drilling, in contrast to developmental drilling, has an expected likelihood of success of about 10 percent.

The Coburn report projected reserves of 518,400 barrels based on 30 notional wells if "water injection is commenced immediately".  The report based its projections on a notional well producing 5 barrels of oil per day, declining thereafter to 3 barrels per day after 24 months.  Without confirmation of known formations in the immediate vicinity of the leasehold, any projection of reserves of 518,400 barrels was wildly over-optimistic.  The yield projection of a notional well over a 15-year life also unrealistically postulated a constant yield over the last 13 years of life of the well.  Such a projection curve is inconsistent with typical oil well production yield curves,

---

[7] Bartlesville Sand is fluvial sand deposited in ancient riverbeds.  The best Bartlesville production is found in the meandering bends of the buried riverbeds in "ox-bow cut-offs" that have a thick sand bar on the inside edge of the bend containing large oil deposits.

irrespective of whether they are produced by natural reservoir mechanisms or by waterflooding.

To obtain a waterflood, injection wells are drilled on an approximately 1:1 ratio with producing wells. This would mean up to 30 (25 if only 25 producing wells were drilled--as the Memorandum called for) additional wells. Neither the Coburn report nor the economic projections in the Stonehurst memorandum accounted for the costs of drilling any such additional wells. There was also no proposal for a water flood injection well pattern.

The Coburn report also asserted that operating expenses for a notional well would be $250 per month, which was too low in 1979 to include water flood operating costs required to support the water injection required to obtain 518,400 barrels of production over 15 years. Even the $290 per well per month projected in the economic projections, which were then inflated at 10 percent per year over 15 years, was too low for operating a water flood.

Even with the problems described supra, the projected reserve of 518,400 barrels, based upon 30 notional wells, is less than the 757,500 barrels assumed by the economic projection A described supra. The turnkey contract also only called for drilling 25 wells in 1980, while the two economic projections both assumed that a total of 55 wells would be drilled, of which 49 would be producers.

The Coburn report itself mentioned "Stonehurst Energy" once, on the first page, in a typeface different from the remainder of the report. In the same paragraph, the last sentence, which claimed that a projection of the future net revenue of a notional well drilled in Bartlesville Sand was included in the report, was also in a typeface different from the rest of the report. The report contained no projection of future revenue from a notional well. It included only a "pro-forma" projection of production from a notional well from 1980 to 1994. The typeface of the address for Stonehurst on the cover letter signed by Coburn is also different from the typeface of the rest of the letter.

f.  The Meserve Firm Federal Tax Opinion Letter

The Meserve firm wrote a letter to Freemond, which was reproduced in the Memorandum ("opinion letter"), expressing legal opinions on various tax issues. The Meserve firm was counsel to Craig, Wind River, and all their affiliates. The Meserve firm was to receive an overriding royalty of an undisclosed percentage of production as its fee for legal services. Additionally, certain partners and associates of the Meserve firm purchased an additional overriding royalty of "less than one half of one percent." The opinion letter asserted that, based upon the Coburn report, Stonehurst had economic substance because the economic projections showed that the:

> oil and gas reserves expected to be produced are adequate to fully pay any Minimum Annual Royalties incurred and to return a profit to investors. The Partnership therefore anticipates a profit independent

of any favorable tax considerations and it is the
objective of the General Partner to realize such a
profit.

The opinion letter claimed that the Coburn report provided a

basis for concluding that Stonehurst had the requisite profit

motive under section 183 to support the deduction of trade or

business expenses.

The opinion letter concluded that the limited partners would

have sufficient amounts "at risk" under section 465 to be

entitled to the deductions projected for 1979 when Stonehurst

incurred liability upon execution of the turnkey contract with

R.H. Energy and execution of the sublease with Craig.  The

opinion letter analyzed various aspects of the minimum annual

royalties, concluding that they met the requirements of "Rev.

Rul. 77-789",[8] because they were nonrefundable, and were

deductible under sec. 1.612-3(b), Income Tax Regs., as

"substantially uniform payments" because the accruals were

properly considered "payments".  The opinion letter also

concluded, provided drilling was completed within 12 months of

Stonehurst's incurring liability under the turnkey contract, that

the entire intangible drilling cost accrued in 1979 would be

deductible by the partnership.  Despite the air of certitude of

the opinion letter, the Memorandum warned that the tax returns of

_____

[8] This was a typographical error in the opinion letter.  The
Internal Revenue Service had issued Rev. Rul. 77-489, 1977-2 C.B.
177.

investors may be subject to an increased "likelihood that a Partner's return will be subject to audit."

g. <u>Mr. Heitzman's Purchase of Interest in Stonehurst</u>

Sometime during 1979, Mr. Heitzman's personal attorney had told Gil Sherman, who was selling interests in Stonehurst, about Mr. Heitzman's possible interest in a tax shelter. During December 1979, Sherman asked Mr. Heitzman if he would be interested in purchasing an interest in Stonehurst in light of his large income that year. Sherman was entitled to receive a 0.5-percent overriding production royalty as compensation for his efforts in selling the partnership units.

Mr. Heitzman had heard from other purchasers of interests in Stonehurst, including his personal attorney and "other substantial business people", that Stonehurst "was a good investment". He read the Stonehurst Memorandum, including the statement in the Coburn report that there was an expected "90% success ratio to be anticipated". Sherman told Mr. Heitzman that other investors in similar limited partnerships had "done well and this one should be great". Sherman said that they "were going to make some money". Mr. Heitzman concluded that Stonehurst was a "good investment" with a "big write-off". Mr. Heitzman was favorably impressed because "it had been researched by a large law firm out of Los Angeles".

On December 17, 1979, Mr. Heitzman purchased 7 limited partnership units in Stonehurst, at the stated price of $6,200

per unit, for a total price of $43,400. Mr. Heitzman paid half in cash on or about that date, with the remainder due on a recourse promissory note on April 1, 1980, which was acknowledged by Stonehurst as having been paid on April 18, 1980. Mr. Heitzman signed a subscription agreement, by which he acknowledged that there was substantial risk that he would lose his entire investment. He also acknowledged that he had been advised of the general nature of the probable tax consequences discussed in the opinion letter, and that he had been further advised by that same letter to "consult with independent tax counsel regarding the tax consequences of participating in the Partnership"--which he did not do. Mr. Heitzman elected to hold his interest in Stonehurst as separate property rather than tenancy in common or joint tenancy with right of survivorship, both of which were offered as alternatives in the subscription agreement.

On or about December 17, 1989, Mr. Heitzman also executed two assumption agreements. In the first assumption agreement, Mr. Heitzman purported to assume personal liability for his $63,364 pro rata share of $1,600,000 of the minimum annual royalty that was to accrue on December 29, 1979. He also purported to assume personal liability for his pro rata share of a portion of the minimum annual royalties to accrue in 1980, 1981, 1982, and 1983. Under the assumption agreement, the limited partners were to incur total additional liability beyond $1,600,000--up to

$3,300,000--only if production for all wells drilled and completed by November 1, 1980, exceeded 30 barrels per day or 2 barrels per day per completed well.  Mr. Heitzman would have personally assumed $130,683 of total liability of $3,300,000 had those production goals been met.  Nothing in the record indicates that any oil was ever produced from the leased acreage.

In the second assumption agreement, Mr. Heitzman purported to assume personal liability of up to $3,779 per unit (for a maximum of $26,453) for payment of drilling and completion costs incurred under the turnkey contract.

3.   Petitioner's Knowledge of Mr. Heitzman's Purchase of an
     Interest in Stonehurst

Mr. Heitzman decided to purchase an interest in Stonehurst without any input from petitioner about the merits of the investment.  It is unclear from the record precisely when Mr. Heitzman apprised petitioner about the Stonehurst purchase. Petitioner was aware of the purchase prior to filing the 1979 joint income tax return.  Regardless of when Mr. Heitzman told petitioner about the transaction, he told her only that Stonehurst "was in oil and gas", would make some money, and was a "tax shelter" that would be reflected in the 1979 return. Mr. Heitzman never explained to petitioner any other aspects of the Stonehurst investment as he then understood them.  He did not explain to her any attributes of Stonehurst as a tax shelter, such as what minimum annual royalties or intangible drilling costs were, nor give her any further information on Stonehurst as

an economic investment. Petitioner never saw the subscription agreement or either of the assumption agreements or any other documents, including the Memorandum, relating to the Stonehurst investment, either prior to Mr. Heitzman's purchasing the interest or at any time thereafter. Mr. Heitzman kept the Stonehurst documents at his office and signed the subscription and assumption agreements there without ever bringing them home.

4.   The 1979 Joint Income Tax Return

In each of the taxable years from 1973 to 1981, including 1979, petitioner and Mr. Heitzman filed joint Federal income tax returns that were prepared by a prominent accounting firm, Alexander Grant, Inc. (Alexander Grant). Each year, when Mr. Heitzman asked, petitioner would give him her Forms W-2, receipts, and other information pertaining to her employment. He would then pass that information to their accountant at Alexander Grant, along with the other information required to complete the return. For taxable year 1979, Mr. Heitzman helped petitioner determine the expenses for her modeling activities by going through the checkbook and other receipts.

Petitioner's 1979 gross income amounted to $3,700, derived entirely from residuals from a television commercial. Petitioner had $3,058 in total deductions, including agency fees and modeling expenses, that were attributable directly to her business activities that year. Her net contribution to taxable income shown on the return was $642.

In 1979, Mr. Heitzman had $145,311 of business income related to his role in the development of a large condominium project by DMA Heitzman. Additionally, Mr. Heitzman earned $33,948 in compensation from TSI Corporation. The 1979 joint income tax return claimed deductions of $110,170 derived from Stonehurst.

On June 14, 1980, petitioner and Mr. Heitzman filed their joint return after obtaining an appropriate extension.

5. <u>Events Subsequent to the Filing of the 1979 Return</u>

On June 22, 1981, Mr. Heitzman and petitioner gave a power of attorney to two accountants employed by Alexander Grant to represent them before the Service for tax year 1979.

In June 1982, petitioner and Mr. Heitzman separated, and he moved to Phoenix, Arizona. On April 11, 1983, the Family Court of the First Circuit of Hawaii granted a final divorce decree to petitioner and Mr. Heitzman. The "Agreement Incident to and in Contemplation of Divorce", dated March 11, 1983, provided that Mr. Heitzman would indemnify petitioner for all deficiencies in State and Federal income tax arising from income tax returns that they filed jointly during their marriage, specifically mentioning a $1,281 assessment by the State of Hawaii for 1979. The agreement also entitled Mr. Heitzman to any refunds due from those taxable years.

Mr. Heitzman and petitioner each signed separate Forms 872C, "Consent to Extend Time to Assess Tax", extending the period of limitations for taxable year 1979 until June 30, 1984.

In May 1983, Mr. Heitzman traveled to Nowata County, Oklahoma, to investigate the Stonehurst lease. Mr. Heitzman found several abandoned wells and associated piping and machinery at the sites of the leaseholds. The surrounding area was also littered with abandoned oil wells.

Petitioner reported $2,374 in adjusted gross income for 1983. Petitioner may have had up to $4,461 in additional adjusted gross income for 1983, although that additional income may have been reported in other taxable years.[9]

In June 1984, Mr. Heitzman filed for bankruptcy after the failures of his businesses, DMA Heitzman and Autocast. These failures were precipitated by the death of Mr. Heitzman's partner

---

[9] For taxable year 1983, petitioner reported $2,374 in adjusted gross income. Petitioner received an additional $2,250 in support payments during 1983 that were not reported on her 1983 tax return. She also received a check for $1,000, written on Dec. 27, 1982, for the January 1982 support payment. The record does not reflect whether that check was reported on petitioner's 1982 return.

Petitioner also received a check for $16,000, dated Dec. 27, 1983, as the final installment payment from the sale of the house, of which 18.92 percent was taxable income, or $3,027. Using the Schedule D attached to petitioner's 1983 tax return, 40 percent of that amount, or $1,211, would have been reported as gross income on petitioner's Form 1040 in 1983 if it was to be included in her 1983 gross income. The record does not reflect whether that amount was reported on petitioner's 1984 return.

in DMA Heitzman, who had been backing him in both businesses, and the financial failure of another financial backer of Autocast.

On June 28, 1984, respondent timely issued a statutory notice of deficiency to Mr. Heitzman and petitioner, determining a deficiency of $55,263 for calendar year 1979. On September 20, 1984, Mr. Heitzman filed a petition with this Court in the names of himself and petitioner, under docket No. 33436-84. On September 26, 1984, petitioner filed a separate petition, docket No. 33938-84, in response to the same notice. In her petition, petitioner disputed the same factual matters as Mr. Heitzman's petition and raised additional issues of the period of limitations and relief as an innocent spouse. On August 9, 1985, Mr. Heitzman filed a motion to dismiss petitioner from the case under docket No. 33436-84. On September 10, 1985, that motion was granted.

On October 10, 1985, the State of Hawaii mailed Mr. Heitzman a notice of assessment based on an increased Hawaii State income tax liability of $11,727 that was based upon disallowance of the deduction with respect to Stonehurst by the Internal Revenue Service.

On December 29, 1986, Wind River sent a letter to the Stonehurst limited partners inviting them to sign an "Agreement, Release, Consent and Vote to Dissolve" that would terminate Stonehurst and provide a means to "reduce" the recourse liabilities that the limited partners had purported to assume in

the assumption agreements.  The letter explained that the limited partners were required to sign this agreement in order to reduce their liabilities.  In return, the principal payment date would be extended until December 31, 2001, and the recourse liabilities reduced by a consolidation of operations with another partnership, Consolidated Petroleum Equities, Ltd. (CPE).  The revenues of this new entity were to be applied at a rate of 0.01 percent of "the value of CPE's share of production from its wells before deducting royalties or expenses" for every "$1,000 of outstanding assumed liabilities".  The letter contained no financial projections to illuminate how this would be done.  The proffered documents also purported to release Wind River, Freemond, and other principals from any liability arising from Stonehurst.  On the advice of counsel, Mr. Heitzman did not sign this agreement.

On March 23, 1987, Freemond sent a note to the limited partners, exhorting them to execute the documents described above.  Freemond's note also said that the enclosed partnership Form K-1 would be the last one sent because Stonehurst was being dissolved.

On February 24, 1987, on cross-motions for partial summary judgment in the case under docket No. 33436-84, this Court granted respondent's motion and denied Mr. Heitzman's motion. Heitzman v. Commissioner, T.C. Memo. 1987-109.  We held that, as a matter of law, Mr. Heitzman was not entitled to deduct his

share of the 1979 minimum annual royalty or intangible drilling costs attributable to Stonehurst.  Id.  On October 18, 1988, the Court of Appeals for the Ninth Circuit affirmed.  Heitzman v. Commissioner, 859 F.2d 783 (9th Cir. 1988).

On May 29, 1990, Mr. Heitzman filed for bankruptcy for a second time.  As part of the bankruptcy proceedings, Mr. Heitzman was discharged from any liability resulting from the decision against him in Heitzman v. Commissioner, T.C. Memo. 1987-109.

OPINION

The Code permits married persons to make "a single return jointly of income taxes".  Sec. 6013(a).  Spouses who file a joint return are jointly and severally liable for any tax due on their aggregate income, including interest.  Sec. 6013(d)(3). The sole issue for decision is whether petitioner is entitled to innocent spouse relief from joint liability on her and Mr. Heitzman's 1979 income tax return.

To qualify for statutory relief from joint and several liability under section 6013(e),[10] a putative innocent spouse must establish:  (1) A joint return was made under section 6013;

---

[10] We apply the statute as amended by Congress in 1984 even though the year before us is 1979.  The Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 424(a), 98 Stat. 494, 801-802, amended sec. 6013(e) retroactively to all open tax years to which the 1954 Code applies.

Petitioner argued in the alternative that she met the requirements of sec. 6004 of the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, 102 Stat. 3342, 3685-3686. We need not consider this alternative argument.

sec. 6013(e)(1)(A); (2) there was a substantial understatement of tax attributable to grossly erroneous items of one spouse; sec. 6013(e)(1)(B); (3) at the time of signing the return, the other spouse did not know and had no reason to know that there was such an understatement; sec. 6013(e)(1)(C); (4) taking into account all the facts and circumstances, it would be inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to the understatement. Sec. 6013(e)(1)(D).

For purposes of section 6013(e), an understatement of tax is substantial if it exceeds $500. Sec. 6013(e)(3). With respect to grossly erroneous deductions, the understatement must exceed a specified percentage of the putative innocent spouse's gross income for the "preadjustment year", which is the taxable year immediately preceding the year in which the statutory notice of deficiency was issued. Sec. 6013(e)(4).

The taxpayer has the burden of proving each element by a preponderance of the evidence. Rule 142(a); Stevens v. Commissioner, 872 F.2d 1499, 1504 (11th Cir. 1989), affg. T.C. Memo. 1988-63; Purcell v. Commissioner, 826 F.2d 470, 473 (6th Cir. 1987), affg. 86 T.C. 228 (1986); Sonnenborn v. Commissioner, 57 T.C. 373, 382 (1971). Failure to carry that burden on any one of the elements will prevent a taxpayer from qualifying for innocent spouse relief. Purificato v. Commissioner, 9 F.3d 290, 293 (3d Cir. 1993), affg. T.C. Memo. 1992-580; Stevens v.

Commissioner, supra at 1504; Purcell v. Commissioner, supra at 473.

The parties agree that a joint return was filed. The record also compels the conclusion that the understatement of $55,263 attributable to the items in question was substantial, sec. 6013(e)(3), and we so find.

Respondent has contested each of the remaining issues, including whether the deficiency exceeds the specified percentage of petitioner's adjusted gross income for 1983, her preadjustment year. Sec. 6013(e)(4)(C). Section 6013(e)(4)(A) requires that the substantial understatement exceed 10 percent of the claimant spouse's adjusted gross income (AGI) for the preadjustment year if the AGI is $20,000 or less. We find that petitioner's adjusted gross income for 1983 could not have exceeded $6,835 even if additional items of income described in the record, which may well have been reported in other taxable years, are added to petitioner's reported 1983 adjusted gross income. The understatement of $55,263 exceeds 10 percent of petitioner's 1983 adjusted gross income.

We consider each of the remaining contested elements.

1.  "Grossly Erroneous Items of One Spouse"

    a.  Attributable to Other Spouse

Respondent does not argue that the disallowed Stonehurst deductions claimed on the 1979 return were not attributable to Mr. Heitzman. The record shows that petitioner had no ownership

interest in Stonehurst.  Mr. Heitzman deliberately held his interest in Stonehurst as separate property when he had the opportunity to elect to hold his interest as a joint survivorship tenancy or tenancy in common.  If petitioner and Mr. Heitzman had filed separate returns, Mr. Heitzman would have claimed the deduction on his return, and petitioner would not have been liable for the resulting understatement.  Therefore the disallowed deductions were items attributable to Mr. Heitzman.

b.  Grossly Erroneous Deduction

The Code defines a "grossly erroneous" deduction as one having no basis in fact or law.  Sec. 6013(e)(2).  Neither the Code nor the applicable regulations define "basis in fact or law".  However, Congress did not intend that the innocent spouse defense would allow the putative innocent spouse to escape liability for apparently legitimate claims that are later disallowed.  Friedman v. Commissioner, 53 F.3d 523, 529 (2d. Cir. 1995), affg. in part, revg. and remanding in part T.C. Memo. 1993-549.  Addressing this issue, we have stated that

> A deduction has no basis in fact when the expense for
> which the deduction is claimed was never, in fact,
> made.  A deduction has no basis in law when the
> expense, even if made, does not qualify as a deductible
> expense under well-settled legal principles or when no
> substantial legal argument can be made to support its
> deductibility.  Ordinarily, a deduction having no basis
> in fact or in law may be described as frivolous,
> fraudulent, or * * * phony.  [Belk v. Commissioner, 93
> T.C. 434, 442 (1989); Douglas v. Commissioner, 86 T.C.
> 758, 762-763 (1986).]

We inquire first whether the minimum annual royalty and the intangible drilling expense deductions are grossly erroneous as having no basis in fact or law because they arose from a sham transaction entered into solely for the purpose of obtaining favorable tax consequences.  Sham transactions are not given effect for Federal income tax purposes, Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978); Ferrell v. Commissioner, 90 T.C. 1154, 1199 (1988), and  the claimed deductions arising therefrom are "phony" or "frivolous", without basis in fact or law, and therefore grossly erroneous under section 6013(e)(2), even if an expense or loss is actually incurred.  See, e.g., Bouskos v. Commissioner, T.C. Memo. 1987-574 (deductions arising from coal-mining lease that was "a mere tax shelter designed to enrich the general partners and provide sizable tax deductions to the limited partners" were phony and had no basis in law or fact) (quoting Tallal v. Commissioner, T.C. Memo. 1984-486, affd. 778 F.2d 275 (5th Cir. 1985)); cf. Somervill v. Commissioner, T.C. Memo. 1996-165 (claimed deductions in tax shelter that was a sham were not grossly erroneous because they were "not without some support in the case law") (quoting Finkelman v. Commissioner, T.C. Memo. 1989-72, affd. without published opinion 937 F.2d 612 (9th Cir. 1991)).

The putative innocent spouse must carry the burden of producing evidence of the sham nature of the underlying transaction and the lack of profit motive on the part of the

entity and its principals.  Here, petitioner must establish that,
at the partnership level, Stonehurst was a sham transaction
without profit motive.  Hulter v. Commissioner, 91 T.C. 371, 393
(1988); Fox v. Commissioner, 80 T.C. 972, 1006-1008 (1983), affd.
without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub
nom. Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984), affd.
without published opinions sub nom. Hook v. Commissioner, Kratsa
v. Commissioner, Leffel v. Commissioner, Rosenblatt v.
Commissioner, Zemel v. Commissioner, 734 F.2d 5-7, 9 (3d Cir.
1984); see also Bealor v. Commissioner, T.C. Memo. 1996-435.
This was an issue that was not litigated in Heitzman v.
Commissioner, T.C. Memo. 1987-109, and the record in the case at
hand lacks any direct reference to the economic motives of the
general partner.  Wind River had been organized to act as general
partner in Stonehurst, and Freemond had no previous experience in
oil and gas exploration.  For purposes of our inquiry, Freemond
and Wind River are shadowy figures, present only in the
Memorandum and later letters chronicling Stonehurst's dwindling
prospects of finding oil or natural gas and its ultimate demise.

The evidence in the record that Stonehurst was a sham
transaction is circumstantial, and comes from the following
sources:  (1) The Stonehurst documentation, (2) the testimony and
report of petitioner's expert, Charles M. Bowers, and (3) the
testimony of Mr. Heitzman.  Our analysis of Stonehurst is also
informed by our report in Osterhout v. Commissioner, T.C. Memo.

1993-251, affd. on this issue and revd. in part without published opinion sub nom. Balboa Energy Fund 1981 v. Commissioner, 85 F.3d 634 (9th Cir. 1996), which held similarly structured oil and gas partnerships--which used up-front accruals of minimum advance royalties to generate claims for large tax deductions that were never paid for--to be sham transactions. In Osterhout, we found that "the objective of the * * * [partnerships at issue in that case] was to help investors avoid taxes and to enrich the coffers of the promoters", including Meserve, a partner in the law firm rendering the tax opinion for Stonehurst. There are striking parallels between Osterhout and the case at hand.

In Osterhout, as in the case at hand, the promotional material emphasized the tax benefits available to investors who would benefit regardless of whether oil and gas were actually discovered. An investor in Stonehurst could seemingly "win" by receiving tax deductions far in excess of the amount paid for the partnership interest even if no oil or gas was produced. See Ferrell v. Commissioner, 90 T.C. at 1183; Osterhout v. Commissioner, supra (citing Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984), affg. Fox v. Commissioner, 80 T.C. 972 (1983)).

In cases such as Osterhout, where "the promised tax benefits are suspiciously excessive and the transaction is carried out with complete indifference to profit, it is clear the parties intended to structure the transaction for the tax benefits." Osterhout v. Commissioner, supra (citing Flowers v. Commissioner,

80 T.C. 914, 941 (1983)). The record in the case at hand is replete with similar indicia of indifference to profits on the part of Stonehurst and its principals.

Petitioner's expert, Charles M. Bowers (Bowers), a petroleum engineer registered in Oklahoma, concluded that the Coburn report was egregiously flawed in several ways. In Bowers' view, the most egregious flaw in the Coburn report was the assertion that "commercial oil production can be obtained from the Bartlesville Sand". Because of the unique characteristics of Bartlesville Sand,[11] there would have had to have been previous oil production in commercial quantities on the lease in order for the Coburn report to make such an assertion without its being a gross misrepresentation. The Coburn report referred to no evidence to support its contentions about the likelihood of discovering oil in commercial quantities. Furthermore, Mr. Heitzman testified at trial that the maps he was shown indicated that the closest proven Bartlesville Sand was 8 miles from the leasehold.[12]

Another egregious flaw in the Coburn report was its claim of a 90-percent success rate for exploratory drilling. Likelihoods of success on the order of 90 percent are associated with developmental drilling, which the Memorandum itself defined as

---

[11] See supra n.7.

[12] Now repealed sec. 56(h)(6)(B), providing energy based preference adjustments to the alternative minimum tax, defined the minimum distance of an exploratory well from other wells as 1.25 miles or 800 feet in depth (the exploratory well being deeper).

drilling wells in "the presently proven productive area of an oil or gas reservoir." Despite the representation in the Memorandum that Stonehurst was planning to engage in a developmental drilling program, there were, as discussed supra, no "proven productive areas" on the Stonehurst leasehold. Bowers testified that a 10-percent likelihood of success in exploratory drilling would be relatively generous under the best of conditions.

Consistent with Bowers' opinion that the Coburn report was "disturbingly generic", was the different typeface used in the report whenever it referred to Stonehurst. We believe, based upon Bowers' evaluation and the record as a whole, that the Coburn report could not have been relied upon to support the assumptions in the economic projections. The Coburn report is a strong indication of the lack of profit motive of the Stonehurst partnership and its principals. See Hulter v. Commissioner, 91 T.C. at 393; Fox v. Commissioner, 80 T.C. at 1006-1008.

In Osterhout v. Commissioner, supra, we found that the "promotional valuations pertaining to the prospective oil and gas production of * * * [the partnerships in issue] were inflated." Those inflated valuations were supported by inaccurate geology reports and world oil price projections that were significantly inflated in comparison to actual downward market movements occurring as the leases were entered into in 1981, 1982, and 1983. Id. The economic projections in the Stonehurst Memorandum were similarly unrealistic. See Krause v. Commissioner, 99 T.C.

- 33 -

132, 169-170 (1992), affd. sub nom. <u>Hildebrand v. Commissioner</u>,
28 F.3d 1024 (10th Cir. 1994); see also <u>Tallal v. Commissioner</u>,
T.C. Memo. 1984-486, affd. 778 F.2d 275 (5th Cir. 1985).

The Memorandum used three critically flawed assumptions to
support the economic projections of Stonehurst's asserted
profitability after having paid a 67-percent production royalty.
The first was the assertion in the Coburn report of a 90-percent
chance of finding oil with the projected drilling program, which
as we have found, was completely unwarranted and invalidates the
economic projections.  The Memorandum projected as many as 23
wells producing 5 barrels a day in 1981 out of a total of 25
wells drilled.  A 10-percent likelihood of finding oil at all
renders virtually nil the possibility that Stonehurst could pay
the minimum annual royalty.  This flawed assumption also
highlights internal inconsistencies in the Memorandum, which, on
one page, disavowed any intention to conduct exploratory
drilling, while on another page, warned of the risks involved in
"exploration" for oil.

The second flawed assumption was the projected size of the
reserves.  The Coburn report estimated that only 518,400 barrels
of oil would be produced over a 15-year period, while the
economic projections in the Memorandum projected, without any
additional support, that 757,700 barrels would be produced over a
similar period.  Neither the Coburn report nor the Memorandum
cited any justification for either estimate.  These projected

reserves were particularly unreasonable since the sublease restricted Stonehurst's mineral rights to oil produced from Bartlesville Sand.

Furthermore, the Coburn report assumed that waterflooding would be necessary to obtain 518,400 barrels of oil over 15 years. Bowers testified that waterflooding would require substantial additional capital to support additional drilling and would result in increased operating costs. See also Yates Petroleum Corp. v. Commissioner, T.C. Memo. 1992-146 (discussing economic feasibility of secondary and tertiary oil recovery programs); In re Dept. of Energy Stripper Well Exemption Litigation, 520 F. Supp. 1232, 1244-1247 (D. Kan. 1981), revd. and remanded on other grounds 690 F.2d 1375 (Temp. Emer. Ct. App. 1982) (expert testimony describes waterflood process and expense involved). Neither the Coburn report nor the economic projections in the Memorandum took such costs into account.

The Memorandum's third critically flawed assumption was that 1980 oil prices of $32.50 per barrel would increase at 10-percent per year, compounded annually, peaking at $123.44 per barrel in 1994. Even though Stonehurst was marketed in December 1979, at a time when world oil markets had been destabilized by war in the Middle East, the Iranian revolution, and the resulting embargo, Krause v. Commissioner, 99 T.C. at 134, the Memorandum contained no support for the 10-percent price escalation. Indeed, the price of domestic oil never exceeded $40 in the 1980-81

timeframe. In <u>Krause v. Commissioner</u>, <u>supra</u>, we noted that the peak domestic price in March 1981 was $34.70 per barrel.[13] In <u>Ferrell v. Commissioner</u>, 90 T.C. at 1195 n.27, we took judicial notice that the price of oil in the United States as a whole peaked at $31.77 per barrel in 1981 and declined thereafter to $24.08 per barrel in 1985. Bowers testified at trial that by the early 1990's, the market price of oil worldwide was less than $20 per barrel. Although, as our analysis in cases like <u>Krause v. Commissioner, supra</u>, and <u>Ferrell v. Commissioner</u>, <u>supra</u>, shows, we are aware that such price declines were not forecast in December 1979, the Stonehurst Memorandum provided no support for its wildly over-inflated oil price projections.

The structure of the minimum annual royalty that Stonehurst was to pay Craig was very similar to that described in <u>Osterhout v. Commissioner</u>, <u>supra</u>, where we found such structures "foreign to the oil and gas industry" because of the "speculative nature of an oil well" in comparison to coal mining leases where such royalties are used "due to the definitive quantity of coal that can be mined".[14] In this case, Bowers characterized Stonehurst

---

[13] The spot price of Saudi light crude oil peaked at $46 per barrel in August 1980. <u>Krause v. Commissioner</u>, 99 T.C. 132, 134 (1992), affd. sub nom. <u>Hildebrand v. Commissioner</u>, 28 F.3d 1024 (10th Cir. 1994).

[14] In <u>Osterhout v. Commissioner</u>, T.C. Memo. 1993-251, affd. on this issue and revd. in part without published opinion sub nom. <u>Balboa Energy Fund 1981 v. Commissioner</u>, 85 F.3d 634 (9th Cir. 1996), we cited the expert testimony of Mr. John Teeple, respondent's expert witness, an attorney who had been involved in
(continued...)

as "a very unusual deal.  I've never quite seen one put together like this before."  Bowers' conclusion is supported by the extremely remote possibility that any oil production that could pay the minimum annual royalty would result from the exploratory drilling on the leasehold.

The fees paid to the promoters and the overriding production royalty due to Craig, the sublessor, which were 67 percent of the gross revenues before any expenses, are also unreasonable, especially in light of Stonehurst's highly restricted mineral rights under the lease.  According to the Memorandum, Craig was also to receive 8 percent of the initial capital contribution as a "consulting fee".  The Memorandum and the Meserve firm legal opinion both disclosed interrelationships between the various entities involved in Stonehurst, most notably that R.H. Energy had assigned its rights in the sublease to Craig, and that the Meserve firm was legal counsel to both Stonehurst and Craig.  While the record does not fully develop the scope of these interrelationships, this unanswered question is yet another indication of the indifference of Stonehurst and its principals to the likelihood of any profit that would inure to the investors.[15]

---

[14](...continued)
oil and gas matters since 1960.

[15] We note in passing that the presence of the Meserve firm's legal opinion does not alter our finding that Stonehurst was a sham transaction that rendered the claimed deductions

(continued...)

In <u>Osterhout v. Commissioner</u>, <u>supra</u>, we found that the recourse notes issued by the limited partners to the sublessor of the land leased to the partnerships in issue were "merely * * * a facade to support the current deductibility of the amounts accrued as MAR [minimum annual royalties]".  The recourse notes given to Craig and R.H. Energy and the assumption agreements signed by the 35 individuals who bought partnership units in Stonehurst served exactly the same purpose.

In <u>Osterhout v. Commissioner</u>, <u>supra</u>, the possibility of payment of the notes was so remote as to be illusory.  The likelihood of payment of the notes to Craig and R.H. Energy was just as illusory.  On December 29, 1986, Wind River sent a letter to the Stonehurst limited partners inviting them to sign an agreement that would relieve the principals in Stonehurst of all liabilities and "reduce" the liabilities of the limited partners by providing a means to pay them down and by further delaying the due date of the principal until December 31, 2001.  Such an offer, completely unsupported by reference to any discernible economic reality, suggests that Craig did not entertain any realistic possibility of being paid in the absence of actual oil

_____

[15](...continued)
grossly erroneous.  Like the Martin law firm opinion letter in <u>Osterhout v. Commissioner</u>, <u>supra</u>, with respect to additions to tax for negligence and whether it was reasonable in the circumstances of that case for the taxpayers to rely on it, the Meserve firm's opinion letter is germane in this case only as a factor in determining whether petitioner had reason to know of the grossly erroneous deductions.

or gas production--the remote likelihood of which in 1979 was subsequently confirmed by the lack of any production from the leasehold.

The form of the recourse notes indicates the remoteness of any possibility of payment. In Osterhout v. Commissioner, supra, the principal was not due and payable for 12 years, and the notes themselves were interest free, a form "foreign to the business world." The principal on the Stonehurst note given to Craig was not due for 15 years and was likewise interest free.

Stonehurst was formed solely to enrich the promoters and provide claims to tax deductions for the limited partners. The activities of Stonehurst served no viable economic or commercial profit objective. While we realize that oil and gas exploration is highly speculative and can yield large profits, that Congress enacted certain tax measures to encourage oil and gas exploration, and that the Stonehurst promotional materials contained representations of profitability, the structure of those materials, with their flawed assumptions, internal inconsistencies, and the unbusinesslike structure of the so-called minimum advance royalty, all demonstrate that any possibility of profits was so remote as to be negligible. Compare United States v. Dean, 224 F.2d 26, 29 (1st Cir. 1955) (for purposes of sec. 20.2055-2(b)(1), Estate Tax Regs., "so remote as to be negligible" defined as the "chance which persons generally would disregard as so highly improbable that it might

be ignored with reasonable safety in undertaking a serious business transaction"); see also Estate of Clopton v. Commissioner, 93 T.C. 275, 285-286 (1989); Briggs v. Commissioner, 72 T.C. 646, 656-657 (1979), affd. without published opinion 665 F.2d 1051 (9th Cir. 1981).

We find that Stonehurst, like the partnerships at issue in Osterhout v. Commissioner, T.C. Memo. 1993-251, was a sham transaction entered into for tax benefits without any objective possibility of producing an economic profit independent of the contemplated tax benefits that should not be given effect for Federal income tax purposes. Frank Lyon Co. v. United States, 435 U.S. at 573; Ferrell v. Commissioner, 90 T.C. at 1199. We find that the minimum annual royalty and the intangible drilling costs accrued by Stonehurst in 1979 and claimed by Mr. Heitzman on the 1979 joint return to be completely without basis in fact or law, sec. 6013(e)(2)(B), Belk v. Commissioner, 93 T.C. at 442; Bouskos v. Commissioner, T.C. Memo. 1987-574 citing Douglas v. Commissioner, 86 T.C. at 762-763, and therefore grossly erroneous for purposes of section 6013(e)(1)(B).[16]

---

[16] Because we held in Heitzman v. Commissioner, T.C. Memo. 1987-109, affd. 859 F.2d 783 (9th Cir. 1988), that neither the minimum annual royalty nor the intangible drilling costs could have been claimed as deductions in 1979, as a matter of law, we also find them to be grossly erroneous as being without basis in law. Reser v. Commissioner, 112 F.3d 1258, 1265 (5th Cir. 1997), affg. in part and revg. in part T.C. Memo. 1995-572.

2.   Knowledge or Reason to Know

Petitioner must establish "that * * * she did not know, and had no reason to know, that there was * * * [a] substantial understatement" on the 1979 joint return.   Sec. 6013(e)(1)(C). Respondent does not contend that petitioner had actual knowledge of the understatements on the 1979 return nor would the record support a contention to that effect.   Petitioner did not have actual knowledge of the understatement at the time the 1979 return was signed.

We now turn to whether petitioner had reason to know of the substantial understatement of income tax on the 1979 joint return.   Respondent contends that petitioner did have reason to know.   We disagree.[17]

---

[17] Respondent relies heavily on a letter dated Nov. 25, 1985, that Mr. Heitzman wrote to the Atlanta Appeals Office in response to a request for information from him concerning petitioner.   In that letter, Mr. Heitzman stated that he and petitioner "reviewed very carefully any investment either one of us made during our marriage".   At trial in the case at hand, Mr. Heitzman recanted what he wrote in the letter.

Mr. Heitzman wrote that letter less than 2 years after he and petitioner were divorced.   In 1985, Mr. Heitzman was still very bitter over the failure of his marriage with petitioner. Compounding Mr. Heitzman's bitterness was the bankruptcy of both of his businesses because of the death of his partner, who was also one of his major financial backers, and the financial failure of his other major financial backer. To make matters worse, Mr. Heitzman was also in the early stages of litigation concerning the deficiency arising from the Stonehurst deductions that eventually culminated in the decision in Heitzman v. Commissioner, supra.   He also had not yet been discharged from bankruptcy and may well have hoped for contribution from petitioner irrespective of the "hold harmless" clause in the divorce settlement agreement.

(continued...)

In <u>Bokum v. Commissioner</u>, 94 T.C. 126 (1990), affd. on
another ground 999 F.2d 1132 (11th Cir. 1993), we held that "the
taxpayer claiming innocent spouse status must establish that he
or she is unaware of the circumstances that give rise to error on
the tax return and not merely to be unaware of the tax
consequences".  <u>Id.</u> at 145-146 (citing <u>Purcell v. Commissioner</u>,
86 T.C. 228, 238 (1986), affd. 826 F.2d 470 (6th Cir. 1987)).  In
<u>Bokum v. Commissioner</u>, <u>supra</u> at 146, we held that a putative
innocent spouse's knowledge of the relevant underlying
transaction incident to the grossly erroneous deduction and the
appearance of a large, unexplained deduction on the face of the
income tax return, <u>id.</u> at 148, are both independently sufficient
to cause the putative innocent spouse either to have a reason to
know of the substantial understatement of tax incident to a
grossly erroneous deduction or to impose upon her a duty to
inquire.

---

[17](...continued)
At trial, Mr. Heitzman explained his state of mind:

> you put all that together, and it was pretty * * *
> devastating.  And so, you know, I felt my world has
> fallen apart.  I was bitter because of the marriage
> that didn't work.  I'm sorry. * * * I take full
> responsibility * * * [for] the letter I wrote * * *
> [which] doesn't reflect the facts * * * when I now can
> look at it later.

Based upon Mr. Heitzman's testimony at trial and the
evidence in the record directly contradicting allegations in the
letter, we give the letter no credence.

With respect to petitioner's knowledge of the underlying transaction, which in this case was Mr. Heitzman's purchase of the Stonehurst interest in December 1979, petitioner knew of the bare existence of the transaction, but little more. Both Mr. Heitzman's testimony and that of petitioner herself show that he informed her of his purchase either shortly before it was made or at some point thereafter, prior to the filing of the 1979 return.

In considering whether this bare knowledge of the transaction is sufficient to hold petitioner to have had reason to know of the understatement, we must consider several factors used by this Court and others: (1) The putative innocent spouse's level of education; (2) her involvement in the family's financial affairs; (3) the putative guilty spouse's evasiveness or deceit concerning the family's finances, and; (4) the presence of lavish or unusual expenditures or any large unexplained increase in the family's standard of living. Flynn v. Commissioner, 93 T.C. 355, 365-366 (1989); see also Silverman v. Commissioner, T.C. Memo. 1996-69, revd. on other grounds 116 F.3d 172 (6th Cir. 1997).

Petitioner was a woman of limited education and no financial sophistication who trusted Mr. Heitzman and deferred to him on all business matters. Mr. Heitzman told petitioner that the Stonehurst partnership was a tax shelter "in oil and gas" that would make some money, facts that, to petitioner, were consistent

with a legitimate investment in light of contemporaneous instability in oil prices and supplies.  Given petitioner's lack of financial sophistication, the minimal explanation that she received from Mr. Heitzman was sufficient to apprise her of the existence of the transaction and to allay any questions she might have had under the circumstances, while leaving her effectively without any substantive knowledge of the transaction.

Petitioner's awareness that Stonehurst was a "tax shelter" is not particularly probative, in the context of her limited financial sophistication, of whether she substantively knew of the underlying transaction.  As we have observed in similar cases, in the late 1970's and early 1980's, a person such as petitioner who did not understand tax matters could quite reasonably interpret the term "tax shelter" as legitimately sheltering income from tax, see, e.g., Foley v. Commissioner, T.C. Memo. 1995-16, especially in light of Mr. Heitzman's comment that Stonehurst would "make a lot of money".  It was common knowledge in the 1980's and earlier that "wily investors could find legal ways and means of attaining spectacular tax benefits through cunning investment strategies."  Friedman v. Commissioner, 53 F.3d at 531.  The fact that Stonehurst "was in oil and gas" in 1979, a time when oil prices were rising, only lent further credence to its potential value as a legitimate and possibly quite lucrative investment.

That petitioner was satisfied by Mr. Heitzman's superficial explanation of the Stonehurst transaction precisely captures how uninvolved she was in the family's financial affairs. The only joint investment that Mr. Heitzman and petitioner made together was their home. Mr. Heitzman routinely made investment decisions during their marriage with no participation by petitioner. In petitioner's mind, the Stonehurst purchase was like every other business transaction that Mr. Heitzman had made during their marriage: It was his property and his affair, and petitioner was not privy to any meaningful information about it. Petitioner did not review any documentation such as the Stonehurst Memorandum or the purchase contract or assumption agreements. She knew nothing of the substance of the transaction, nor did Mr. Heitzman discuss with her any of its salient substantive aspects.

While Mr. Heitzman was neither evasive nor deceptive with petitioner about his investment and other financial decisions, by the same token, he brooked no intrusion by petitioner into what he considered his affairs. Mr. Heitzman regarded the Stonehurst purchase and his other, legitimate investments to be his, funded with his money. Petitioner had no role in deciding whether to purchase the Stonehurst interest. She also remained uninvolved in subsequently claiming the deductions incident to that transaction on their 1979 joint income tax return. In any case, given the context of her and Mr. Heitzman's marital relationship, petitioner would never have expected to have had such a role.

Just as surely as if Mr. Heitzman had deliberately hidden the transaction from petitioner, or had deliberately deceived her about its existence or its tax consequences, the dynamics of their marital relationship effectively walled petitioner off from any substantive knowledge of the transaction.

The record also does not reflect any change in the family's standard of living during the 1979-80 timeframe. Indeed, the only change in standard of living was a precipitous decline in petitioner's standard of living in the aftermath of their 1983 divorce.

With respect to the appearance on the 1979 return of the deductions related to Stonehurst, we find that, at the time the return was signed, their appearance on the return would not have caused petitioner to have reason to know of the understatement. To all appearances, they were perfectly valid. Any questions that their size might have engendered had already been allayed because Mr. Heitzman had already apprised petitioner of the purchase in a way that fully legitimized it in her eyes. Furthermore, the return had been prepared and signed by a prominent accounting firm as income tax return preparer and was without any apparent defect. Compare Bokum v. Commissioner, 94 T.C. at 147-148 (taxpayer incurred a duty to inquire by signing a return prepared, but not signed, by an income tax return preparer, which contained a huge, unexplained deduction and an obvious arithmetic error).

Alexander Grant, a prominent national accounting firm, had prepared the 1979 return without raising any question about the Stonehurst deductions. Alexander Grant had prepared each of the joint returns from 1973 to 1981 for Mr. Heitzman and petitioner. Under the circumstances, petitioner was entitled to rely upon the imprimatur of legitimacy that Alexander Grant lent to the joint return. To petitioner, cognizant of Mr. Heitzman's explanation and the manner in which the return was prepared, nothing was amiss.[18]

Even if we were to find that the return should have alerted a reasonable taxpayer to question the deduction as not being legitimate--and we do not so find--to impose a duty to inquire on petitioner under these circumstances would be to impose a duty to perform a futile act. Reser v. Commissioner, 112 F.3d 1258, 1269 (5th Cir. 1997), affg. in part and revg. in part T.C. Memo. 1995-572. She already knew that a qualified income tax return preparer had prepared the return without question, and the duty to inquire "does not extend so far as to impose on a spouse the

_____

[18] The lack of mention in the record that Alexander Grant questioned the deductions claimed pursuant to Stonehurst when it prepared petitioner's and Mr. Heitzman's 1979 joint return does not change the analysis of whether those deductions were grossly erroneous. We cannot determine from the record whether Alexander Grant's actions were reasonable or not in signing the return based on the information available to them, nor need we answer that question. It suffices for our purposes that the return was signed by a respected income tax return preparer, and petitioner acted reasonably in relying on that signature with respect to whether petitioner should have questioned the validity of the deductions claimed on the returns.

duty to seek advice from her own independent legal and financial advisers". Friedman v. Commissioner, 53 F.3d at 531. Even if petitioner had asked any questions, her lack of financial sophistication, her nonexistent role in Mr. Heitzman's business and investment activities, and Mr. Heitzman's attitude toward petitioner's participation in those affairs, would have allowed her to uncover no more than she already knew. Had Mr. Heitzman shown petitioner the pertinent documents, their aura of verisimilitude would have provided her with little to question. The fundamental mendacity of the documents could have been uncovered only by a much more sophisticated and skeptical investor--which, in 1980, petitioner was not. Even the warning to seek the opinion of independent tax counsel would not have caused petitioner to question the deductions claimed on the return because the return bore the imprimatur of an independent and respected income tax return preparer.

For purposes of sec. 6013(e)(1)(C), we find that, under the circumstances of this case, petitioner neither knew nor had reason to know of the understatement on the 1979 joint income tax return. She had no effective knowledge of the relevant underlying transaction nor did she have a duty to inquire into the validity of the deductions arising from the transaction that were claimed on the 1979 joint income tax return. Bokum v. Commissioner, 94 T.C. at 145-148; Flynn v. Commissioner, 93 T.C. at 365-366.

3.   Equities

Petitioner must show, based on all the facts and circumstances, that it would be inequitable to hold her liable for the deficiency attributable to the substantial understatement.  Sec. 6013(e)(1)(D); sec. 1.6013-5(b), Income Tax Regs.  Relevant factors include:  (1) Whether the taxpayer seeking relief significantly benefited, directly or indirectly; (2) whether the spouse seeking relief has been deserted, divorced, or separated from the other spouse, and; (3) the probable hardships that would befall the spouse seeking relief if she were not relieved of joint liability.

The record reveals that petitioner did not significantly benefit from the grossly erroneous deduction attributable to Mr. Heitzman's interest in Stonehurst.  Mr. Heitzman spent $43,400 purchasing his interest.  His total claimed State and Federal income tax savings were $66,990.  Mr. Heitzman netted no more than $23,590 from the Stonehurst deductions.  The record does not show the disposition of these funds.  However, money being fungible, petitioner must show that she did not even indirectly benefit.

Normal support does not constitute a "significant benefit", Flynn v. Commissioner, supra at 367, and is measured by the circumstances in each case, id.  Petitioner's and Mr. Heitzman's standard of living, while comfortable throughout this period, did not appreciably change in 1979 or thereafter until they separated

in 1982, when petitioner's disposable income dropped precipitously.

The remodeling of the family residence was completed and paid for prior to Mr. Heitzman's ever having contemplated the purchase of his interest in Stonehurst and was not funded in any way by the tax savings. Indeed, petitioner had used her own limited resources in 1979 to make additional improvements to the residence. Even if the cost of remodeling could have been traced indirectly to the tax savings, the remodeling contributed little to any increase in the value of the residence between 1979 and 1982, when it was sold pursuant to their divorce settlement. Such increases were entirely attributable to market forces and the desirable location and quality of the house.

Another factor to be taken into account is the 1983 divorce between petitioner and Mr. Heitzman. Flynn v. Commissioner, 93 T.C. at 367; sec. 1.6013-5(b), Income Tax Regs. There is nothing in the record to indicate that petitioner received any more in the divorce settlement, which primarily consisted of her share of the proceeds from the sale of the residence and about $14,000 in alimony, than she otherwise would have. In view of the standard of living that petitioner and Mr. Heitzman enjoyed while married, such a settlement is well within the bounds of normal support. See, e.g., Foley v. Commissioner, T.C. Memo. 1995-16. The divorce also takes on added importance in light of the provision in the settlement agreement whereby Mr. Heitzman agreed to

indemnify petitioner for all deficiencies arising from their joint returns and of Mr. Heitzman's subsequent bankruptcies in 1984 and 1990, which have apparently relieved him of his obligations under the divorce settlement agreement.

Despite Mr. Heitzman's agreement in the divorce settlement that he was and would be responsible for any income tax deficiencies, his 1990 bankruptcy discharged him from any liability on the deficiency upheld against him in Heitzman v. Commissioner, T.C. Memo. 1987-109, thus imposing on petitioner the burden of paying the deficiency of $55,263 and more than 17 years of accrued interest of at least four times that amount if she does not qualify for innocent spouse relief.

Finally, respondent argues, citing McCoy v. Commissioner, 57 T.C. 732, 734-735 (1972), that both Mr. Heitzman and petitioner were equally ignorant of the income tax consequences of the Stonehurst deduction and should therefore be held jointly liable. Respondent's reliance on McCoy v. Commissioner, supra, is misplaced. The case at hand is one that the innocent spouse provisions were intended to reach--Mr. Heitzman and petitioner were not equally ignorant of the income tax consequences of the Stonehurst deduction. Cf. Pewitt v. Commissioner, T.C. Memo. 1997-288 (wife and husband were equally knowledgeable--and equally ignorant of Federal income tax consequences--wife attended sales meeting where both she and husband were informed of tax benefits and risks). Mr. Heitzman was consciously trying

to shelter income from taxation in 1979. While Mr. Heitzman was not guilty of any wrongdoing in striving to minimize his tax burden, he failed to ensure that he was not taking a frivolous position in claiming the deductions. By his own admission, he did no research and did not seek an opinion from independent tax counsel either prior to his purchase of the interest or prior to claiming the deductions on the 1979 return.[19]

Furthermore, the Stonehurst interest was entirely Mr. Heitzman's. He had all of the relevant information solely in his possession--including the warning to seek the opinion of an independent tax counsel--and he should have known that the deductions were, to say the least, questionable. Petitioner was privy to none of that information, and, as we have already found, she had no reason to know of the understatement because Mr. Heitzman had given her sufficient information to dispel any disquiet she might have had under the circumstances. Friedman v. Commissioner, 53 F.3d at 531; Foley v. Commissioner, supra. Thus, we find that it would be inequitable, under the facts and circumstances of this case, to hold petitioner liable for the

---

[19] There is nothing in the record to indicate whether the Alexander Grant income tax return preparers were apprised of sufficient facts concerning Stonehurst to cause them to question the deduction more closely. That issue is not relevant to this case. What the record does reflect is that, as far as petitioner was concerned, Alexander Grant had given the return its imprimatur by preparing and signing it without comment. Cf. Bokum v. Commissioner, 94 T.C. 126, 147-148, 156 (1990), affd. on another ground 992 F.2d 1132 (11th Cir. 1993).

deficiency attributable to the understatement on the 1979 tax return.

Petitioner has established every element of entitlement to innocent spouse relief.  By reason of the foregoing,

Decision will be entered

for petitioner.